**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

RECEIVED
JUN 01 2012
U.S.D.C. S.D.N.Y.
CASHIERS

| | |
|---|---|
| MARCO PETERS, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>JINKOSOLAR HOLDING CO., LTD., XIANDE LI, KANGPING CHEN, XIANHUA LI, WING KEONG SLEW, HAITAO JIN, ZIBIN LI, STEVEN MARKSCHEID, LONGGEN ZHANG, CREDIT SUISSE SECURITIES (USA) LLC, OPPENHEIMER & CO. INC., ROTH CAPITAL PARTNERS, LLC, WILLIAM BLAIR & CO., and COLLINS STEWART LLC,<br><br>Defendants. | No. 11 Civ. 7133 (JPO)<br><br><u>JURY TRIAL DEMANDED</u> |

**AMENDED CLASS ACTION COMPLAINT**

1. Lead Plaintiffs Vaughn Leroy Meyer, Richard Matkevich, Abdullah al-Mahmud, and Azriel Shusterman ("Lead Plaintiffs" or "Plaintiffs"), by and through their undersigned counsel, allege the following upon information and belief, except as to those allegations concerning Lead Plaintiffs, which are alleged upon personal knowledge. Lead Plaintiffs' information and belief are based upon, among other things, Lead Counsel's investigation, which includes without limitation, review and analysis of filings with the United States Securities and Exchange Commission ("SEC"), press releases, news articles, analyst reports, as well as an investigation in the People's Republic of China ("PRC"). Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

2. Lead Plaintiffs bring this action individually and on behalf of all persons and entities who purchased or otherwise acquired JinkoSolar Holding Co., Ltd. ("JinkoSolar" or "JKS" or the "Company") New York Stock Exchange-traded ADSs (the "ADSs") between May 13, 2010 and September 20, 2011 (the "Class Period"), either in or traceable to a May 13, 2010 initial public offering (the "May Offering"), a November 4, 2010 secondary offering (the "November Offering"), or otherwise on the open market, and were damaged thereby.

3. JKS is a solar power product manufacturer with operations based in Jiangxi Province and Zhejiang Province in China, and is one of the world's larger manufacturers of photovoltaic ("PV") products, including crystalline ingots, wafers, cells and mono- and multi-crystalline PV panels. As discussed below, PV products are notorious for producing as by-products toxic chemicals such as fluorides during their production.

4. After initially being in the business of producing silicon wafers and solar modules, JKS branched out into the solar cell business in 2009, with its acquisition of Zhejiang Sun Valley Energy Application Technology Co., Ltd. ("Sun Valley"). After acquiring Sun Valley, JKS's solar cell production grew at breakneck speed. As of December 31, 2009, JKS had annual solar cell production capacity of 150 MW (or megawatts). In the second quarter of 2010, the Company expanded its annual solar cell manufacturing capacity from approximately 200 MW as of March 31, 2010, to approximately 300 MW as of June 30, 2010. Six months later, by December 31, 2010, its capacity had doubled to 600 MW. One year later, as of December 31, 2011, JKS's solar cell production capacity had doubled to approximately 1.2 GW, or 1200 MW.

5. But JKS's environmental compliance did not keep up with its rapid expansion. Indeed, in June 2010 – just one month after the May 2010 initial public offering ("IPO") that

starts the Class Period – JKS submitted a report to the Haining environmental protection bureau in connection with the expansion of its solar cell manufacturing capacity at its Zhejiang plant, or in close proximity to it. The report discussed "existing problems" with environmental compliance. Specifically, the Company stated that it was not disposing of hazardous solid waste in accordance with relevant disposal methods, and was emitting high levels of fluorides. This crucial information was not disclosed to JKS's shareholders.

6. Unbeknownst to shareholders, environmental issues continued to plague JKS throughout the Class Period. In February and July 2011, the Company submitted additional reports to the same environmental bureau in connection with additional solar cell manufacturing capacity expansions. Both reports discussed high levels of fluorides in the water in areas surrounding the Company's solar cell plant. In April 2011, the Company received a pre-trial production notice from the environmental bureau informing JKS of high fluoride levels in its waste. On May 11, 2011, the environmental bureau again detected higher than acceptable levels of fluoride at JKS, this time in its waste water. Importantly, none of these facts were disclosed to investors during the Class Period.

7. The Underwriter Defendants (defined below) would have learned about these environmental compliance issues in the due diligence they performed in connection with JKS's initial and secondary public offerings. Indeed, as discussed below, the Underwriter Defendants should have been particularly careful about their due diligence because Chinese companies engaged in solar manufacturing are notorious for abysmal environmental compliance.

8. Yet, throughout the Class Period, Defendants made misleading statements to investors relating to compliance with environmental laws and the Company's treatment of its

waste products. Defendants specifically failed to disclose the crucial fact that JKS was not properly disposing of the Company's waste.

9. These statements were materially false and misleading when made. However, JKS investors did not begin to learn the truth until weeks after a local catastrophe caused by JKS occurred in late August 2011. In this regard, on Thursday, September 15, 2011, news started to break that local residents living near JKS's solar cell plant in Zhejiang angrily demonstrated outside the facility following a massive die-off of fish over the previous month in the river flowing immediately adjacent to the plant. Over the next three days, as JinkoSolar stonewalled its neighbors, the protests became increasingly violent, and some protestors broke into the facility, overturning cars (including four police cars) and damaging buildings. Authorities "detained" several of the protesters. JinkoSolar security guards beat up several reporters and damaged their video equipment. Throughout it all, however, the Zhejiang plant continued to operate.

10. On September 15, 2011, JKS ADSs fell by 20 cents, from $10.02 to $9.82, or a loss of 2.0%. On Friday September 16, 2011, shares fell more rapidly as investors started to get hints of the scope of the problem. The ADSs lost 78 cents, falling from $9.82 to $9.04, or a loss of 8%. Over the weekend of September 17-18, 2011, tests confirmed that JinkoSolar was polluting the river with sludge containing toxic fluorides, and the PRC government ordered the facility to stop production and take remedial action. The plant closure and additional details about the disaster and JKS's environmental compliance were slowly reported in the Western press on Sunday, September 18, 2011, Monday, September 19, 2011 and Tuesday, September 20, 2011. After the riot over the weekend and JinkoSolar's decision to shut the facility down, JKS shares got walloped on Monday morning, September 19, 2011, falling to $6.50, a loss of

$2.54, or 28%. As the market digested more news on Tuesday, September 20, 2011, shares dropped another 9.4%, falling to $5.89. From the closing price of $10.02 on Wednesday, September 14, 2011, the ADSs lost approximately 40% of their value in a single week as a direct result of the disaster in Haining, closing at $5.89 on Tuesday, September 20, 2011.

11. Only after the protests and plant closure did JinkoSolar even admit that it had been fined for failing to comply with environmental regulations back in May 2011 for issues relating to high fluoride levels. JinkoSolar also admitted, belatedly, that on September 7, 2011, the Company agreed to pay compensation for crop damage as well as the death of any livestock and wildlife arising from the pollution incident, but never bothered to tell investors of the mounting problems until it issued a press release on September 22, 2011, following the news that had been reported piecemeal over the previous week.

12. Lead Plaintiffs assert securities fraud claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 on behalf of purchasers of the ADSs during the Class Period, and assert non-fraud prospectus liability claims – for which Defendants are strictly liable – under Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 on behalf of purchasers of ADSs in or traceable to the May and/or November Offerings.

**JURISDICTION AND VENUE**

13. The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 771 and 77o, and under and pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

14. This Court has subject matter jurisdiction over this action pursuant to Section 22 of the Securities Act, Section 27 of the Exchange Act, and 28 U.S.C. § 1331.

15. This Court has personal jurisdiction over the JinkoSolar Defendants (defined below) pursuant to Section 22 of the Securities Act and Section 27 of the Exchange Act because they transact business in this District, and because they consented to jurisdiction in any state or federal court in New York, New York, by the terms of the Form of Deposit Agreement incorporated by reference into the Prospectus governing the May 2010 IPO (the "May Prospectus").

16. This Court has personal jurisdiction over the Underwriter Defendants (defined below) pursuant to Section 22 of the Securities Act, Section 27 of the Exchange Act, and because all have offices in this District.

17. Venue is proper in this District pursuant to Section 22 of the Securities Act, Section 27 of the Exchange Act, and pursuant to 28 U.S.C. § 1391(a), (b), and (c) because all Defendants transact business in this District, and because the JinkoSolar Defendants consented to jurisdiction in any state or federal court in New York, New York, by the terms of the Form of Deposit Agreement incorporated by reference into the May Prospectus.

**PARTIES**

18. Lead Plaintiffs purchased ADSs during the Class Period, as described in the certifications attached to their lead plaintiff motion, and suffered damages as a result of Defendants' violations of the federal securities laws described herein.

19. Lead Plaintiff Richard Matkevich bought JKS ADSs on November 3, 2010, which ADSs were traceable to the May Prospectus.

20. Additional named plaintiff Ronald Snyder purchased JKS ADSs on October 28, 2010, which ADSs were traceable to the May Prospectus. *See* Exhibit A hereto.

21. Lead Plaintiff Abdullah al-Mahmud bought JKS ADSs on November 4, 2010, which ADSs were traceable to the November Prospectus.

22. Defendant JinkoSolar is incorporated under the laws of the Cayman Islands, with its corporate headquarters at 1 Jingke Road, Shangrao Economic Development Zone, Jiangxi Province, People's Republic of China. JinkoSolar has additional offices in Zug, Switzerland; Munich, Germany; Bologna, Italy; and Montpellier, France. Its North American headquarters are located at 100 Pine Street, San Francisco, California. Defendant JinkoSolar has two primary manufacturing facilities in China, one in Jiangxi Province, and one in Zhejiang. JinkoSolar has appointed CT Corporation System, 111 Eighth Avenue, 13th Floor, New York, NY 10011, as its authorized agent upon which process may be served, pursuant to the terms of the Form of Deposit Agreement governing the ADSs.

23. Defendant Xiande Li is co-founder of JinkoSolar and was Chairman of the Board of Directors during the entire Class Period. Xiande Li signed the May and November Prospectuses. The "May Prospectus" refers collectively to the May 14, 2010 prospectus and registration statement incorporated therein. The "November Prospectus" refers collectively to the November 4, 2010 prospectus and registration statement incorporated therein.

24. Defendant Kangping Chen is co-founder of JinkoSolar and was CEO and a Director during the entire Class Period. Chen signed the May and November Prospectuses. Chen is the brother-in-law of Defendant Xiande Li.

25. Defendant Xianhua Li is co-founder of JinkoSolar and was a Director and Vice-President during the entire Class Period and signed the May and November Prospectuses. Defendant Xianhua Li is the brother of Defendant Xiande Li.

26. Defendant Wing Koen Siew was a Director of JinkoSolar during the entire Class Period. Siew signed the May and November Prospectuses.

27. Defendant Haitao Jin was a Director of JinkoSolar during the entire Class Period. Jin signed the May and November Prospectuses.

28. Defendant Zibin Li was a Director of JinkoSolar during the entire Class Period. Zibin Li signed the May and November Prospectuses.

29. Defendant Steven Markscheid was a Director of JinkoSolar during the entire Class Period. Markscheid signed the May and November Prospectuses.

30. Defendant Longgen Zhang is a U.S.-certified public accountant, and was the CFO of JinkoSolar during the entire Class Period. Zhang is listed as the contact person for the Company in all filings made with the SEC, and signed the May and November Prospectuses.

31. Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") is an investment bank headquartered at 11 Madison Avenue, New York, New York. It is the U.S. arm of Credit Suisse Group AG in Switzerland. Credit Suisse was the lead underwriter and sole global coordinator and bookrunner for the May Offering, and agreed to distribute 3,501,000 of the 5,835,000 shares offered. Credit Suisse was also the lead underwriter for the November Offering, and agreed to distribute 2,555,000 of the 3,500,000 shares offered.

32. Defendant Oppenheimer & Co., Inc. ("Oppenheimer") is an investment bank headquartered at 125 Broad Street, New York, New York. Oppenheimer was an underwriter in the May 13, 2010 offering of JinkoSolar ADSs, and agreed to distribute 1,021,125 of the 5,835,000 shares offered.

33. Defendant Roth Capital Partners, LLC ("Roth Capital Partners") is an investment bank headquartered in Newport Beach, CA, with a regional office at 730 Fifth Avenue, New York, New York. Roth Capital Partners was an underwriter in the May 13, 2010 offering of JinkoSolar ADSs, and agreed to distribute 1,021,125 of the 5,835,000 shares offered. Roth

Capital Partners was also one of the underwriters for the November Offering, and agreed to distribute 332,500 of the 3,500,000 shares offered.

34. Defendant Collins Stewart LLC ("Collins Stewart") is an investment bank headquartered at 350 Madison Avenue, New York, New York. It is the U.S. arm of UK brokerage Collins Stewart plc. Collins Stewart was an underwriter in the May 13, 2010 offering of JinkoSolar ADSs, and agreed to distribute 291,750 of the 5,835,000 shares offered. Collins Stewart was also one of the underwriters for the November Offering, and agreed to distribute 245,000 of the 3,500,000 shares offered.

35. Defendant William Blair & Co. ("William Blair") is an investment bank with offices at 666 Fifth Avenue, New York, New York, 10103. William Blair was one of the underwriters for the November Offering, and agreed to distribute 332,500 of the 3,500,000 shares offered.

36. Defendants JinkoSolar, Xiande Li, Kangping Chen, Xianhua Li, Wing Keong Siew, Haitao Jin, Zibin Li, Steven Markscheid, and Longgen Zhang are collectively known as the "JinkoSolar Defendants."

37. Defendants Xiande Li, Kangping Chen, Xianhua Li, Wing Keong Siew, Haitao Jin, Zibin Li, Steven Markscheid, and Longgen Zhang are collectively known as the "Control Person Defendants" or the "Individual Defendants."

38. Defendants Credit Suisse, Oppenheimer, Roth Capital Partners, Collins Stewart, and William Blair are collectively known as the "Underwriter Defendants."

39. Defendants Xiandi Li, Kangping Chen, and Xianhua Li are collectively known as the "Founders."

## NON-FRAUD ALLEGATIONS

> *"We cannot shirk responsibility for the legal consequences which have come from management slips."*
>
> –Jing Zhaohui, spokesman for JinkoSolar, at a news conference following the disaster in Haining

### A. THE ENVIRONMENTAL HAZARDS OF PV MANUFACTURING

40. JinkoSolar is one of the world's larger manufacturers of PV (photovoltaic) products, including crystalline ingots, wafers, cells and mono- and multi-crystalline PV panels. As discussed in an article entitled "Toward a Just and Sustainable Solar Energy Industry," published by the Silicon Valley Toxics Coalition on January 14, 2009, despite solar power's reputation for being "green," PV-cell manufacturing is a toxic business. Silicon-based solar PV production involves many of the same materials as the microelectronics industry and therefore presents many of the same hazards.

41. Among other things, in PV cell manufacturing, the processes of silicon wafer texturing and etching generate a highly toxic fluoride solution as a by-product. JinkoSolar stated that its waste water treatment system used alkaline chemicals to neutralize the fluoride solution and the calcium fluoride solid was then separated from the waste water. As discussed below, JKS's treatment of its fluoride wastes was woefully inadequate throughout the Class Period.

### B. THE PROBLEM OF PV MANUFACTURING-RELATED POLLUTION IN THE PEOPLE'S REPUBLIC OF CHINA

42. The environmental hazards associated with the manufacture of PV cells is universal, but the extent to which manufacturers are able (or willing) to responsibly contain the problem differs from country to country. Nowhere is the problem more acute, however, than in the PRC.

43. Over the past 15 years, China has rapidly become the dominant force in PV manufacturing, bringing on line dozens of facilities, and now accounting for more than 50% of total shipments of PV modules and cells:

| Year | US | Europe | Japan | China/Taiwan | TOTAL SHIPMENTS |
|---|---|---|---|---|---|
| 1997 | 42% | 18% | 25% | 3% | 114.1 |
| 1998 | 38% | 21% | 27% | 3% | 134.8 |
| 1999 | 32% | 17% | 39% | 2% | 175.5 |
| 2000 | 30% | 23% | 38% | 2% | 252.0 |
| 2000 | 27% | 24% | 41% | 1% | 352.9 |
| 2002 | 21% | 24% | 46% | 3% | 504.9 |
| 2003 | 14% | 28% | 52% | 2% | 675.3 |
| 2004 | 13% | 28% | 52% | 4% | 1049.7 |
| 2005 | 9% | 29% | 51% | 8% | 1407.7 |
| 2006 | 7% | 31% | 44% | 12% | 1984.6 |
| 2007 | 8% | 32% | 29% | 25% | 3073.0 |
| 2008 | 7% | 31% | 22% | 32% | 5491.8 |
| 2009 | 5% | 18% | 16% | 46% | 7913.3 |
| 2010 | 6% | 15% | 12% | 54% | 17402.3 |

44. The price of this rapid expansion, however, has been massive environmental damage. While it typically takes companies outside of the PRC two years to get a PV factory up and running, some Chinese companies are hoping to do it in half the time.

45. According to an article in the *Washington Post* dated March 14, 2008, many Chinese companies have failed to invest in technology needed to prevent pollutants from getting into the environment, despite government regulations requiring appropriate disposal and treatment of toxic waste. Shi Jun, a former PV technology researcher at the Chinese Academy of Sciences, admitted in the article that the necessary technologies are "still not mature" in China.

46. As an example of the extent of the problem, the *Washington Post* arranged to test a sample of dirt from a dump site near a PV manufacturing facility (not owned by Defendant JinkoSolar). The tests showed high concentrations of chlorine and hydrochloric acid which do not exist naturally in soil. Crops cannot grow, and it is dangerous for people to live near the site.

47. The *Post*'s findings mirror what other researchers have found. One researcher has observed some companies stockpiling hazardous substances in the hopes that they can figure out a way to dispose of them later. According to the article, some were simply dumping the waste.

48. Shi Jun told the *Post* that under PRC regulations, "companies should collect it all, process it to get rid of the poisonous stuff, then release it or recycle." Shi estimates that Chinese companies are saving millions of dollars by not installing required pollution-recovery technology.

49. Shi Jun also noted that some of China's low-cost producers could not possibly produce the necessary PV components at such low cost if environmental regulations were being followed. For example, the cost to produce polysilicon, a key component in PV products, would be approximately $84,500 per ton if appropriate environmental technology were used. However, some Chinese companies were producing it for $21,000 to $56,000 per ton.

50. As more and more facilities are being constructed in China, the stories keep repeating. The *Post* article also noted that in one village outside a new PV facility, villagers noticed that their crops were wilting under a dust of white powder. Sometimes, there was a hazy cloud up to three feet high near the facility's dumping site. The factory's chimneys would release a loud "whoosh" of acrid air that stung the villagers' eyes and made it hard to breathe.

51. As explained herein, JKS did not heed these lessons and, instead, polluted the environment with highly toxic chemicals.

## C. JKS VIOLATED ENVIRONMENTAL REGULATIONS SINCE THE TIME OF ITS IPO AND THROUGHOUT THE CLASS PERIOD

52. JKS commenced operations in June 2006. JKS's manufacturing facilities for the production of silicon ingots, wafers and solar modules are located in Shangrao, Jiangxi Province,

while manufacturing facilities for the production of solar cells are located in Haining, Zhejiang Province.

53. JKS's product mix has evolved rapidly since the Company's inception, as it expanded its production capabilities to manufacture and sell downstream solar power products and to capture the efficiencies of JKS's vertically integrated production process. In 2006, JKS's sales consisted entirely of recovered silicon materials. In 2007, JKS sold recovered silicon materials and monocrystalline ingots. In 2008, JKS's sales consisted of monocrystalline wafers and ingots, and recovered silicon materials. Commencing in 2009, JKS retained a substantial majority of JKS's output of recovered silicon materials and silicon ingots for JKS's own production of silicon wafers.

54. In July 2009, the Company acquired Sun Valley, a solar cell manufacturer and supplier, which is also one JKS's largest silicon wafer customers by revenue. This purchase allowed JKS to begin producing solar cells. The name of Sun Valley was changed to Zhejiang JinkoSolar Co., Ltd., or Zhejiang Jinko.

55. JKS grew its solar cell manufacturing capacity by leaps and bounds after acquiring Sun Valley in 2009. As of December 31, 2009, JKS had annual solar cell production capacity of 150 MW (or megawatts). In the second quarter of 2010, the Company expanded its annual solar cell manufacturing capacity from approximately 200 MW as of March 31, 2010, to approximately 300 MW as of June 30, 2010. Six months later, by December 31, 2010, its capacity had doubled to 600 MW. One year later, as of December 31, 2011, JKS's solar cell production capacity had doubled to approximately 1.2 GW, or 1200 MW.

56. In May 2010, the Company decided to fuel its rapid growth by tapping into the U.S. capital markets. On May 13, 2010, JKS launched its initial public offering, selling

5,835,000 ADSs pursuant to the May Prospectus. Each share was offered for $11 per share, which raised $64,185,000 for the Company.

**The Company's June 2010 Report Admits JKS Does Not Comply With Environmental Regulations and Reports Issues With JKS's Waste Systems**

57. On June 8, 2010 – only one month after the May 2010 IPO – the Company submitted to the Haining Environmental Protection Bureau (the "EPB") an environmental impact assessment (the "June 2010 EIA") in connection with the further expansion of its solar cell manufacturing business at or near the Zhejiang plant.

58. This expansion was explicitly contemplated in the May Prospectus, which stated that "[w]e estimate that we will receive net proceeds from this offering of approximately US$54.8 million (or US$63.6 million if the underwriters exercise the option to purchase additional ADSs from us in full) after deducting underwriting discounts and estimated aggregate offering expenses payable by us. We intend to use the net proceeds from this offering primarily for the following purposes: **approximately US$45 million to expand our silicon ingot, silicon wafer, solar cell and solar module production capacity, including procuring new equipment and expanding or constructing manufacturing facilities for silicon ingot, silicon wafer, solar cell and solar module production**;..." (Emphasis added).

59. The Company submitted the June 2010 EIA to the Haining EPB on June 8, 2010. The June 2010 EIA was entitled the "Zhejiang Jinkosolar Co. Ltd Capital Increase and Implementation of the 100 MW Solar Pool Cell and 50 MW Supporting Battery Project (Third Phase)."

60. The June 2010 EIA related to **solar cell manufacturing capacity expansion at or near the Zhejiang plant. The Zhejiang plant was the site of the fish die-off incident in late August 2011.**

61. The June 2010 EIA contains a section entitled "Existing Problems" which lists ongoing violations of environmental regulations relating to toxic waste removal, as well as poor efficiency in absorbing fluoride levels – which were markedly high. The report states as follows:

> 1. Existing Problems
>
> 1. The tube used for the discharge of chlorine (Discharge Tube A) currently has a height of 15 metres. This does not meet the minimum height requirements.
>
> 2. According to monitoring data from the Haining City Environmental Protection Bureau, HCl concentration levels in the region surrounding the enterprise have exceeded set limits. The concentration levels from the monitoring data are in the range of 0.058 - 0.196mg/m3. The area surrounding the project does not have capacity for storing HCl. If this project continues to use HCl cleaning processes then once completed this would worsen the HCl pollution situation in the local area.
>
> 3. **Sludge produced by the enterprise is classed as hazardous solid waste. This has not been disposed of in accordance with relevant State disposal methods.**
>
> 4. **Presently, the tower operated by the enterprise to absorb acidic mist has 35% efficiency in removing inorganic fluorides, which means that industrial emission volumes for fluorides are comparatively large.** (Emphasis added).

62. In later sections in the June 2010 EIA, entitled "Measures for Restructuring and Reform" and "Environmental Impact Prediction, The Main Conclusions," the Company outlined steps it needed to take to begin to tackle the above-listed issues. In the case of the Company's management of hazardous waste, the Company lists a number of measures required to be taken by JKS:

> 2. Measures for Restructuring and Reform
>
> 1. Once the project is operating, the enterprise should carry out extension works on Discharge Tube A, thereby increasing its height to 25m, in line with the requirements....

**3. To store sludge temporarily within the plant, permission must be sought with the Environmental Protection Administrative and Supervisory Department. The company must also construct storage facilities in strict accordance with the "Standards for Pollution Control Relating to the Storage of Hazardous Waste" and apply strict anti-seep, anti-leakage measures in the temporary storage zone. When cement for the flooring in the storage zone solidifies, drains should be installed to connect them to the adjustment pool. A rain shed should be constructed to prevent rain water from soaking into and seeping through into underground water and ground-level water, which could result in undesirable environmental consequences. The company should sub-contract the handling and treatment of the hazardous waste to a firm that is qualified to deal with it. This case of waste-handling should be reported to the Environmental Protection Administrative and Supervisory Department to enable the implementation of a tracking system and prevent secondary pollution and casual trading.**

4. The tower that is currently operated for the absorption of acidic mist will be subject to some alteration works. The results of this environmental assessment require the enterprise to alter the absorption tower from a Grade 1 filling extraction tower to a Grade 3 filling extraction tower. The Grade 3 absorption tower shall also be fitted with a dynamic carbon extraction facility as a supplementary device, **resulting in an inorganic fluorides removal efficiency rate of above 90%....**

Solid Waste Impact

[W]astewater treatment sludge is a hazardous solid waste, companies need to configure a dedicated indoor storage unified carefully stored up to a certain amount and then commissioned qualification units to deal with. In addition, waste drums containing silicon oxide, silicon nitride, the sludge may configure dedicated indoor location carefully stored up to a certain amount and then by the supplier of recycling or take-away handle. Under normal circumstances, the impact of solid waste on the environment through the rain, wind, and other effects produce secondary pollution of water and air, but as long as the company after the completion of the practical implementation of the above-mentioned solid waste disposal measures, strengthen management [sic], **timely collection removal and transportation in a timely manner to avoid secondary pollution caused due to rain erosion,** solid waste will not cause adverse effects on the surrounding environment after proper disposal. [Sic] (Emphasis added).

63. The quoted information in the June 2010 EIA Report was not disclosed to JKS shareholders.

64. Based on the breadth and detail of the June 2010 EIA report, it must have taken weeks, if not months, to prepare. Thus, this report describes conditions at or near the Zhejiang plant at the time of the May 2010 IPO, if not earlier

65. This report demonstrates that the Company was on notice that the Zhejiang plant was not properly disposing of waste materials, and that it was emitting high levels of toxic fluorides. These were red flags to the Company that there were ongoing environmental issues at the Zhejiang plant. Indeed, fluorides were the main culprit throughout and at the end of the Class Period and led to fines and mass protests against the Company.

**The Company Admits High Fluoride Levels in Water**
**In Areas Surrounding the Zhejiang Facility in the February 2011 Report**

66. As the Company continued to grow its solar cell manufacturing capacity, it submitted more environmental assessment reports to the Haining EPB relating to the Zhejiang solar cell plant and surrounding areas. The next report submitted to the Haining EPB was apparently on February 22, 2011 (the "February 2011 EIA Report"). This report was entitled "Zhejiang Jinko Solar Co. Ltd. 1,000 MW Battery and 1,000 MW Production Line Capacity Increase Project."

67. The February 2011 EIA Report noted continued high levels of fluorides in water in areas surrounding the Zhejiang Jinko plant:

> According to river monitoring data, the water quality in the area around the Yangshan River near to the [Zhejiang Jinko] site does not satisfy the Grade 3 standard. The main reason is that CODCr, BOD5 **and various fluorides** have been found in excessive quantities, resulting in water from nearby rivers being markedly polluted.... (Emphasis added).

68. This report demonstrates that the Company was on notice that there were high levels of toxic fluorides in areas surrounding the Zhejiang plant. These were red flags to the

Company that there were ongoing environmental issues and, in particular, fluoride issues, associated with the Zhejiang plant.

69. The information in the February 2011 EIA Report was not disclosed to JKS shareholders.

**JKS's April and May 2011 Run-Ins With The Haining EPB**

70. JKS continued its polluting ways. In this regard, as the Company only belatedly admitted after the Class Period in a September 22, 2012 conference call, as well as in a Form 6-K filed with the SEC on that day, on April 19, 2011, the Zhejiang plant failed waste-disposal pollution tests due to high fluoride levels in Company waste. The Company claimed in the September 22nd call that it merely received a "pre-trial production" notice, but Chen Hongming, deputy head of Haining's Environmental Protection Bureau, told the *China Daily* in September 2011 that the Company did, in fact, fail pollution tests in April 2011. Notably, Class members did not know about the April incident until after the Class Period. *Asian News International* also reported in September 2011 Mr. Hongming's statement that the Company failed pollution tests in April.[1]

71. The Company had another undisclosed incident with high fluoride levels in May 2011. Indeed, the Company belatedly admitted in the September 22nd conference call, and in a Form 6-K of the same day, that, on May 11, 2011, the Haining EPB again detected higher than acceptable levels of fluoride at JKS, this time in its waste water. JinkoSolar was ultimately fined RMB470,000. JinkoSolar claims the fine was appealed and withdrawn, but admits that the fine

[1] In the September 22nd call, the Company also claimed these high levels of fluoride never left the plant or leaked into the environment. Even if true, the pattern of high fluoride levels, both in the Zhejiang Jinko plant and in the surrounding area, noted by the Company in the June 2010 EIA Report, the February 2011 EIA Report, the May 2011 incident (discussed below, *see* paragraph 71), and the July 2011 Report, as well as the fish die-off incident in August 2011, is unmistakable.

was reimposed on September 17, 2011. Again, investors did not know of this May 2011 incident until after the Class Period.

72. A February 2012 report published in *New Century* provided greater detail about the April and May 2011 EPB investigations. The report suggested that the EPB found JKS's sewage diversion network to have been "incomplete" and allowed waste to enter storm water pipes. The *China News* report cited in paragraph 123 stated that the EPB declared that measures to tackle the sewage network remained **unfinished** at the time of the September 2011 protests.

73. These incidents further demonstrate that the Company was on notice of environmental issues, including high levels of toxic fluorides, at the Zhejiang plant. These were additional red flags to the Company that there were ongoing environmental issues, including issues relating to levels of fluorides, at the Zhejiang plant. Yet, Defendants allowed these issues to persist until the end of the Class Period and made misleading statements throughout the Class Period relating to the Company's compliance with pollution laws and regulations.

**The Company Again Admits High Fluoride Levels in Water Surrounding the Zhejiang Facility in the July 2011 Report**

74. The environmental issues continued like clockwork. On July 7, 2011, the Company submitted to the Haining EPB a report entitled "Zhejiang Jinko Co. Ltd. 600 MW Solar Cell Production Line Expansion Project" (the "July 2011 EIA Report"). This report also related to the Zhejiang solar cell plant and surrounding areas. As with the February 2011 EIA Report, this report noted high fluoride levels in water surrounding the Zhejiang Jinko facility:

> According to current statistics, the Yuanxigang River's quality does not meet Grade 3 standards, the main factors being that DO, CODCr, BOD5, ammonia and **fluoride** levels have already been exceeded, leading to the Yuanxiang River's current contamination...
>
> The sewage discharged by the enterprise consists of various types of waste water, mainly: acidic or alkaline waste water from the processes of cleaning

silicon sheets, waste water with high concentrations of **fluoride**, acidic or alkaline waste water containing **fluoride** from cleaning processes involved with washing emission towers,... (Emphasis added).

75. This report further demonstrates that the Company was on notice that there were high levels of toxic fluorides in areas surrounding the Zhejiang plant. These were additional red flags to the Company that there were ongoing environmental issues at the Zhejiang plant.

76. Indeed, because these red flags were present throughout the Class Period – in three EPB reports, as well as in the April and May 2011 incidents – the Company was under a duty to monitor and correct these issues (as well as disclose the truth to JKS's shareholders) to ensure that JKS was complying with all relevant environmental regulations. This did not happen. Rather, these fluoride issues culminated in mass protests, property damage, and a shutdown of the plant at the end of the Class Period. Indeed, the fish die-off incident of late August 2011 was a natural outgrowth of the Company's poor environmental compliance throughout the Class Period.

77. The quoted information in the July 2011 EIA Report was not disclosed to JKS shareholders.

### D. DEFENDANTS' MISREPRESENTATIONS IN THE MAY AND NOVEMBER OFFERING DOCUMENTS

78. On May 13, 2010, the Company launched the IPO, offering 5,835,000 ADSs pursuant to the May Prospectus (filed with the SEC pursuant to Rule 424(b)(4) and the ninth and final version of the Registration Statement, filed with the SEC the same day). Each share was offered for $11 per share, which raised $64,185,000 for the Company. The May Prospectus was signed by Defendants Li, Chen, Xianhua Li, Zhang, Siew, Jin, Zibin Li, and Markscheid.

79. The underwriters for the November Prospectus were Credit Suisse, William Blair, Oppenheimer, Roth Capital and Collins Stewart. These underwriters were required to perform

due diligence before underwriting this offering. Any reasonable due diligence would have uncovered the red flags discussed above in paragraphs 57-77.

80. In the May Prospectus, JinkoSolar stated that it was engaged in a toxic business, and would have to comply with PRC regulations in order to operate:

> ***Environment***
>
> We generate and discharge chemical wastes, waste water, gaseous waste and other industrial waste at various stages of our manufacturing process as well as during the processing of recovered silicon material. **We have installed pollution abatement equipment at our facilities to process, reduce, treat, and where feasible, recycle the waste materials before disposal, and we treat the waste water, gaseous and liquid waste and other industrial waste produced during the manufacturing process before discharge. We also maintain environmental teams at each of our manufacturing facilities to monitor waste treatment and ensure that our waste emissions comply with PRC environmental standards. Our environmental teams are on duty 24 hours. We are required to comply with all PRC national and local environmental protection laws and regulations** and our operations are subject to periodic inspection by national and local environmental protection authorities. PRC national and local environmental laws and regulations impose fees for the discharge of waste materials above prescribed levels, require the payment of fines for serious violations and provide that the relevant authorities may at their own discretion close or suspend the operation of any facility that fails to comply with orders requiring it to cease or remedy operations causing environmental damage. As of December 31, 2009, no such penalties had been imposed on us.

81. The highlighted statements concerning environment compliance and JKS's treatment of its waste were materially false and misleading when made for the following reasons:

a) JKS was improperly storing and disposing of waste containing fluoride throughout the Class Period (*see* ¶¶ 57-77);

b) JKS was cutting corners on environmental compliance throughout the Class Period (*see* ¶ 119);

c) JKS's means of storing toxic waste were inadequate as demonstrated by the extensive remedial measures taken by JKS at the end of the Class Period (*see* ¶ 129), the extensive measures the Haining EPB directed JKS to take (*see* ¶ 130), and the measures the Company stated it should have taken in the June 2010 EIA Report (¶ 62);

d) JKS's equipment utilized in storage, and treatment, of toxic waste was antiquated and insufficient (*see* ¶¶ 120-21);

e) Defendants failed to disclose that JKS's Zhejiang plant had high levels of fluorides throughout the Class Period (*see* ¶¶ 57-77);

f) Defendants failed to disclose that JKS was not disposing of toxic waste in accordance with relevant PRC regulations (*see* ¶¶ 57-77);

g) Defendants ignored red flags relating to high levels of fluorides in and around the Zhejiang plant throughout the Class Period (*see* ¶¶ 57-77);

h) JKS's protocols for waste collection were inadequate because the Company's waste removal company supposedly picked up waste every three days, while the Company only had enough room to store four days of waste, leaving little or no margin for error (*see* ¶¶ 136-37) – particularly in light of the Company's insistence on "timely collection removal" in the June 2010 EIA Report (¶ 62); and

i) JKS's Zhejiang plant had failed pollution tests throughout the Class Period 2011 (*see* ¶¶ 57-77).

82. The May Prospectus also falsely stated:

> ***Compliance with environmental, safe production and construction regulations can be costly, while non-compliance with such regulations may result in adverse publicity and potentially significant monetary damages, fines and suspension of our business operations.***
>
> We use, store and generate volatile and otherwise dangerous chemicals and wastes during our manufacturing processes, **and are subject to a variety of government regulations related to the use, storage and disposal of such hazardous chemicals and waste. We are required to comply with all PRC national and local environmental protection regulations.** (Italics in original; emphasis added).

83. The highlighted statements were materially false and misleading when made for the reasons given in paragraph 81.

84. In connection with the May Offering, certain JKS officers were granted over 700,000 shares of in-the-money options. In this regard, the May Prospectus stated: "We agreed to grant certain of our officers and employees options to purchase 726,250 ordinary shares at an

exercise price of 85% of the initial public offering price per share in January 2010, but changed the exercise price to US$2.08 per share [or under 20% of the IPO price] in April 2010." JKS did not name the grantees but they almost certainly include several Individual Defendants.

85. This did not go unnoticed in the analyst community. Writing about the May 2010 IPO, a Renaissance Capital IPO Research analyst noted on June 22, 2010 noted that "[w]hile there was no insider selling on the IPO, a concurrent grant of more than 700,000 in-the-money options raises red flags."

86. Before the Company's May 2010 IPO, it had Goldman Sachs (Asia) LLC lined up as the lead underwriter and Credit Suisse as the co-manager for the IPO. Goldman, however, ultimately did not participate in the IPO. The Company provided no reason why Goldman was not used in the IPO, nor why Credit Suisse became the lead underwriter with several other underwriters added.

87. On May 14, 2010, Terrence Murray published an article entitled "Jinko Solar IPO Priced Low; New Underwriters Listed". The article stated in pertinent part:

> The SEC filing lists Credit Suisse as well as Oppenheimer & Co., Roth Capital Partners and Collins Stewart as underwriters. A January filling listed Goldman Sachs and Credit Suisse as underwriters but an April filing had Credit Suisse as the sole underwriter, Reuters reports.
>
> Jinko is taking advantage of growing demand in the U.S. and Europe for the sort of cheap silicon wafers and cells it manufactures back home in China. The company says it plans to use proceeds from the offering to expand its manufacturing, to fund R&D and for working capital.
>
> Supply of Chinese-made silicon PV panels are growing fast and the issue for Jinko, and its competitors, is whether they can remain competitive as PV discounters, selling panels that offer no real technological value-added.
>
> On the changes in the underwriting roster, we've got calls out and will post with any updates.

88. On October 26, 2010, the Company filed a registration statement for a secondary ADS offering of 3.5 million JKS ADSs. Of these 3.5 million ADSs, 2 million were sold by JKS and 1.5 million by several selling shareholders, including 300,000 ADSs offered by the three Founders (Defendants Chen, Xiande Li, and Xianhua Li), of which 150,000 ADSs were offered by related entities Brilliant Win Holdings Limited, 90,000 by Yale Pride Limited, and 60,000 by Peaky Investments Limited.

89. Indeed, several of the Individual Defendants, or their family members, are principals of these latter three entities:

> (a) Brilliant Win Holding Limited is a British Virgin Islands company which is wholly owned by HSBC International Trustee Limited in its capacity as trustee of an irrevocable trust constituted under the laws of the Cayman Islands, **with Defendant Xiande Li as the settlor and Yixuan Li, daughter of Xiande Li** and Cypress Hope Limited, a British Virgin Islands company wholly owned by **Xiande Li**, as the beneficiaries.... **Xiande Li** is the sole director of Brilliant Win Holding Limited and as such has the power to vote and dispose of the ordinary shares held by Brilliant Win Holding Limited, subject to the powers of HSBC International Trustee Limited as trustee. Therefore, **Xiande Li** is the beneficial owner of all our ordinary shares held by Brilliant Win Holding Limited.
>
> (b) Yale Pride Limited is a British Virgin Islands company which is wholly owned by HSBC International Trustee Limited in its capacity as trustee of an irrevocable trust constituted under the laws of the Cayman Islands, **with Defendant Kangping Chen** as the settlor and Min Liang, Dong Chen, Xuanle Chen and Xiaoxuan Chen, all of whom are family members of Kangping Chen, and Charming Grade Limited, a British Virgin Islands company wholly owned by **Kangping Chen**, as the beneficiaries.... **Kangping Chen** is the sole director of Yale Pride Limited and as such has the power to vote and dispose of the ordinary shares held by Yale Pride Limited, subject to the powers of HSBC International Trustee Limited as trustee. Therefore, **Kangping Chen** is the beneficial owner of all our ordinary shares held by Yale Pride Limited.
>
> (c) Peaky Investments Limited is a British Virgin Islands company which is wholly owned by HSBC International Trustee Limited in its capacity as trustee of an irrevocable trust constituted under the laws of the Cayman Islands, with **Defendant Xianhua Li** as the settlor and Jianfen Sheng, Sheng Li and Muxin Li, **all of whom are family members of Xianhua Li**, and

> Talent Galaxy Limited, a British Virgin Islands company wholly owned by **Xianhua Li**, as the beneficiaries.... **Xianhua Li** is the sole director of Peaky Investments Limited and as such has the power to vote and dispose of the ordinary shares held by Peaky Investments Limited, subject to the powers of HSBC International Trustee Limited as trustee. Therefore, **Xianhua Li** is the beneficial owner of all JKS ordinary shares held by Peaky Investments Limited.

90. The Underwriters Defendants for the November Prospectus were Credit Suisse, William Blair, Roth Capital and Collins Stewart. These underwriters were required to perform due diligence before underwriting this offering. Any reasonable due diligence would have uncovered the red flags discussed above in paragraphs 57-77.

91. The November Prospectus falsely stated, in pertinent part:

> Environment
>
> We generate and discharge chemical wastes, waste water, gaseous waste and other industrial waste at various stages of our manufacturing process as well as during the processing of recovered silicon material. **We have installed pollution abatement equipment at our facilities to process, reduce, treat, and where feasible, recycle the waste materials before disposal, and we treat the waste water, gaseous and liquid waste and other industrial waste produced during the manufacturing process before discharge. We also maintain environmental teams at each of our manufacturing facilities to monitor waste treatment and ensure that our waste emissions comply with PRC environmental standards. Our environmental teams are on duty 24 hours. We are required to comply with all PRC national and local environmental protection laws and regulations** and our operations are subject to periodic inspection by national and local environmental protection authorities. PRC national and local environmental laws and regulations impose fees for the discharge of waste materials above prescribed levels, require the payment of fines for serious violations and provide that the relevant authorities may at their own discretion close or suspend the operation of any facility that fails to comply with orders requiring it to cease or remedy operations causing environmental damage. As of the date of this prospectus, no such penalties had been imposed on us.

92. The highlighted statements were materially false and misleading when made for the reasons given in paragraph 81.

93. The November Prospectus also stated:

> ***Compliance with environmental, safe production and construction regulations can be costly, while non-compliance with such regulations may result in adverse publicity and potentially significant monetary damages, fines and suspension of our business operations.***
>
> We use, store and generate volatile and otherwise dangerous chemicals and wastes during our manufacturing processes, **and are subject to a variety of government regulations related to the use, storage and disposal of such hazardous chemicals and waste. We are required to comply with all PRC national and local environmental protection regulations**.... (Italics in original; emphasis added).

94. The highlighted statements were materially false and misleading when made for the reasons given in paragraph 81.

## FRAUD ALLEGATIONS

95. On April 25, 2011, the Company issued its 2010 year-end report filed with the SEC on Form 20-F (the "Annual Report" or the "Form 20-F"), signed by Defendant Kangping Chen.

96. The Annual Report falsely stated:

> ***Environment***
>
> We generate and discharge chemical wastes, waste water, gaseous waste and other industrial waste at various stages of our manufacturing process as well as during the processing of recovered silicon material. **We have installed pollution abatement equipment at our facilities to process, reduce, treat, and where feasible, recycle the waste materials before disposal, and we treat the waste water, gaseous and liquid waste and other industrial waste produced during the manufacturing process before discharge. We also maintain environmental teams at each of our manufacturing facilities to monitor waste treatment and ensure that our waste emissions comply with PRC environmental standards. Our environmental teams are on duty 24 hours. We are required to comply with all PRC national and local environmental protection laws and regulations** and our operations are subject to periodic inspection by national and local environmental protection authorities. PRC national and local environmental laws and regulations impose fees for the discharge of waste materials above prescribed levels, require the payment of fines for serious violations and provide that the relevant authorities may at their own discretion close or suspend the operation of any facility that fails to comply with orders requiring it to cease or remedy operations causing

environmental damage. As of the date of this annual report, no such penalties had been imposed on us.

97. The highlighted statements were materially false and misleading when made for the reasons given in paragraph 81.

98. The Annual Report also stated as follows:

> ***Compliance with environmental, safe production and construction regulations can be costly, while non-compliance with such regulations may result in adverse publicity and potentially significant monetary damages, fines and suspension of our business operations.***
>
> **We use, store and generate volatile and otherwise dangerous chemicals and wastes during our manufacturing processes, and are subject to a variety of government regulations related to the use, storage and disposal of such hazardous chemicals and waste. We are required to comply with all PRC national and local environmental protection regulations.** (Italics in original; emphasis added).

99. The highlighted statements were materially false and misleading when made for the reasons given in paragraph 81.

100. On May 10, 2011, the Company issued its 2010 year-end report filed with the SEC on Form 20-F/A, signed by Defendant Kangping Chen. In this amended Annual Report, which contained the financial statements for 2008, 2009 and 2010, the Company made very similar representations to those in the original 20-F (*see* paragraph 96) about the importance of complying with all laws and regulations. Again, no mention was made of any environmental problems. The statements in the 20-F/A that were substantially similar to those in the April 25, 2011 20-F were materially false and misleading when made for the reasons given in paragraph 81. Further, at this time, the Company had conceded existing environmental problems in June 2010; conceded that there were high levels of fluorides in water nearby the Zhejiang Jinko plant in February 2011; and was under investigation by the Haining EPB for an April 2011 incident.

101. Moreover, on the very next day, May 11, 2011, the Haining EPB detected higher than acceptable levels of fluoride in the water at JKS. JinkoSolar was ultimately fined RMB470,000. JinkoSolar claims the fine was appealed and withdrawn, but admits that the fine was re-imposed on September 17, 2011. Critically, this was not disclosed until after the Class Period on September 22, 2011.

102. JinkoSolar was under a duty to issue a Form 6-F to correct any statement in the prior 20-F that had become false or misleading. On May 11, 2011, once the local government detected the pollution, JinkoSolar was under a duty to issue a Form 6-F and tell investors that it had high fluoride levels in its water and was being investigated by the Haining EPB. JinkoSolar never issued the required 6-F.

103. On June 17, 2011, the Company announced the resignation of Mr. Guoxiao Yao, Chief Technology Officer, "for personal reasons".

104. On August 4, the Company received a notice from the local environmental bureau informing JKS of higher than acceptable levels of fluoride in JKS's waste water sent through the municipal sewer system on May 11 and issued JKS a penalty of RMB470,000. As noted, the Company claims that it appealed this decision and on August 7, that the fine was withdrawn.

105. As noted, these facts were not disclosed to investors until after the Class Period on September 22, 2011.

## THE CHICKENS COME HOME TO ROOST – JINKOSOLAR'S CONTINUAL ENVIRONMENTAL VIOLATIONS CAUSE A LOCAL CATASTROPHE

106. In late August, 2011, local residents noticed a large-scale die-off of fish in the river immediately adjacent to the Zhejiang plant. Residents were also concerned with contamination of land downstream from the facility. On September 7, 2011, JinkoSolar apparently acknowledged locally that it had released toxic waste into the river, and agreed to pay

compensation for crop damage as well as for the death of any livestock and wildlife arising from the pollution incident.

107. As with past infractions, JinkoSolar was under a legal duty to file a 6-F and share the news with investors in the United States, because the Company's earlier statements regarding environmental compliance, JKS's treatment of its waste, and PRC environmental laws were materially misleading. Once again, JinkoSolar did not file a Form 6-F, and still did not tell U.S. investors about the release of toxic waste in August, or the failure of pollution control tests in April. Investors did begin to learn the truth about JKS's poor environmental compliance until September 15, 2011.

108. On September 2, 2011, Defendants filed another amended annual report on Form 20-F/A, which contained largely the same misstatements as those discussed above in paragraph 96. Again, no mention was made of the fish die-off or the ongoing environmental violations. Incredibly, even after the fish-die off incident in late August, 2011, the statements in the September 2, 2011 20-F/A are substantially similar to those in the April 25, 2011 20-F concerning environmental compliance and waste treatment. These statements were materially false and misleading when made for the reasons given in paragraph 81. Further, at this time, the Company had conceded existing environmental problems in June 2010; conceded that there was high levels of fluorides in water nearby the Zhejiang Jinko plant in February 2011; had been under investigation by the Haining EPB for the April and May 2011 incidents; and – most critically – had just witnessed the local catastrophe of the fluoride leak and resulting fish die-off.

109. It is not clear the extent to which local residents around the facility knew of the supposed September 7, 2011 offer to mitigate damage, because in the subsequent week, passions

continued to grow. JinkoSolar refused to shut down the facility while determining the cause of the contamination.

110. On the night of September 15, 2011, with the facility still running, approximately 500 people from nearby Hongxiao Village gathered outside the facility to demand an explanation for the fish deaths and other signs of contamination. The protests escalated on September 16 and 17, culminating in a riot on the third day during which the protestors stormed the facility, damaged buildings, and overturned cars. Thirty-one protesters were detained by police, as were three JinkoSolar employees, for beating up two reporters from the Hangzhou-based Qianjiang television station and damaging their video equipment. At this point, the plant "voluntarily" closed, at the urging of the government. The protests were the vehicle for reporting on JinkoSolar's pollution problems, and the share price drop in New York accelerated in tandem with the increasingly alarming news.

111. On September 15, 2011, the ADSs fell by 20 cents, from $10.02 to $9.82, or a loss of 2.0%. On Friday September 16, 2011, shares fell more rapidly as investors started to get hints of the scope of the problem. The ADSs lost 78 cents, falling from $9.82 to $9.04, or a loss of 8%.

112. On September 17, 2011, the local environmental bureau issued a new penalty notice to JKS for the same amount as that of the fine reportedly canceled on August 7, 2012.

113. On September 18, 2011, *Reuters* published the following article by Royston Chan:

> (Reuters) - Residents of a village in east China accused riot police of heavy-handed tactics after a three-day protest against a solar panel factory accused of dumping toxic waste was brought to an end on Sunday.

"We are being silenced," said a protester who would only give his surname as Cao, at an industrial park on the outskirts of Haining in Zhejiang province as police in riot gear sealed off the site.

"Some people were beat up during the protests. Why can we just tell the truth about this pollution. Now people talking to reporters are also being detained: what justice is there?"

The protests began on Thursday, when as many as 500 people stormed a compound owned by the New York-listed Jinko Solar Holding Co, official news agency Xinhua reported on Sunday.

Protesters overturned vehicles before being dispersed, but they continued to camp outside the factory until the riot police with helmets, vests, batons and shields arrived late on Sunday.

Toxic waste from the factory, which manufactures photovoltaic panels, cells and wafers, killed large numbers of fish in a nearby river, and authorities had already ordered the company to suspend operations, the news agency said. Protesters put up banners with the slogan "Return our lives to us, stay away from Jinko," according to photographs published on the website of the National Business Daily newspaper (www.nbd.com.cn) on Sunday.

An elderly woman who did not want to give her name complained bitterly about the local government's tactics.

"The factory has been polluting us all this while and now that we make some noise, the government shuts us up. They are all in this together, now we just have to die here silently. You can see all these riot police here, we are just helpless villagers."

**Xinhua quoted an environmental official as saying that Jinko had failed to bring the problem under control and the factory's waste disposal facilities had been failing pollution tests since April.**

Pollution has emerged as one of the biggest problems facing China's ruling Communist Party, which has struggled to contain growing public anger against industries improperly dumping toxic waste….(Emphasis added)

114. A September 18, 2011 article published in *Youth Times* reported that Zhang Jian, an official with the Jiaxing Municipal Environmental Protection Bureau, stated in a blog that an environmental investigation of the Haining plant found that "waste water disposal is not standardized, resulting in sometimes waste water leakage to the outside environment…"

115. Also on September 18, 2011, *The New York Times* quoted the state-run China News Agency as reporting that after the August-September river contamination, "government inspectors later found that the water contained 10 times the acceptable amount of fluoride." (http://www.nytimes.com/2011/09/19/world/asia/chinese-protesters-accuse-solar-panel-plant-of-pollution.html). Similarly, an unnamed Zhejiang Environmental Protection Bureau official told a Chinese news source in September 2011 that the plant produces 7 to 10 tons of solid waste every day. (Link to Chinese news article: http://www.donews.com/it/201109/614828.shtm).

116. After the adverse September 18, 2011 news, the riot over the weekend, and JinkoSolar's decision to shut the facility down, JKS shares got walloped on Monday morning, September 19, 2011, falling to $6.50, a loss of $2.54, or 28%.

117. On September 19, 2011, the Company issued the following press release:

> SHANGHAI, September 19, 2011 / -- JinkoSolar Holding Co., Ltd. ("JinkoSolar" or the "Company") (NYSE: JKS) a fast-growing, vertically-integrated solar power product manufacturer based in China, today addressed the environmental concerns that have surfaced at its facility in Haining city, Zhejiang Province, China in recent days.
>
> There have been reports that Zhejiang Jinko Co., Ltd. ("Zhejiang Jinko"), a wholly owned subsidiary of JinkoSolar in Haining, Zhejiang Province, China, discharged hazardous waste into a river, prompting local residents to protest at its facility from September 15 to September 17, 2011. The local environmental protection authority is investigating the incident. In response to the concerns of local residents and in full cooperation with the local government's investigation, Zhejiang Jinko has suspended operations at its facility in Haining until the impact of any potential environmental damage has been assessed and remedied. **An initial investigation conducted by the local environmental protection authority indicates that the pollution may have been caused by the improper storage of waste containing fluoride.**
>
> **The Company will take all necessary steps to ensure that it is in compliance with all environmental rules and regulations. Any deficiencies in environmental protection uncovered will be immediately remedied. The Company expects that its facility in Haining will resume operations within the next few days.**

The Company has sincerely apologized to local residents of Haining and its employees for any inconveniences caused.

The Company's facility in Haining had the capacity to produce 1,100 MW of solar cells per year as of June 30, 2011. The temporary suspension of operation in Haining will have no material impact on the business in its Shangrao facility, which mainly produces silicon ingots, silicon wafers and solar modules. To make up for the temporary wafer-to-cell processing shortfall, the Company expects to outsource the cell processing to a third party vendor under a "tolling" arrangement. The halt in production is not expected to have material impact on the Company's operations and module delivery commitment to its customers. The Company will update the market as the situation evolves. (Emphasis added).

118. If the Company had taken the appropriate measures it discussed in the June 2010 EIA Report, it would not have had to belatedly "take all necessary steps to ensure that it is in compliance with all environmental rules and regulations."

119. On September 19, 2011, analyst Mehdi Hosseini with Susquehanna Financial Group, LLLP took JKS to task for "corner cutting" on environmental compliance:

The fact that local authorities have shut down a 1.1GW cell manufacturing facility due to improper storage of waste **underscores our thesis that operational and product quality comes at a cost; or to put it differently, cutting corners to inflate margins could last for only a few quarters....**

This morning Jinko announced after the open that its cell facility in Haining has been shut down due to a local authorities request. This request has been made after an investigation by local authorities following the recent incident in which the local residents reported environmental damage associated with this facility (that manufactures solar cells with capacity of 1.1GW). **After the initial investigation by the local authorities, it was determined that the facility has caused environmental hazards by the improper storage of wastes containing fluoride**. (Emphasis added).

120. Sources suggest that the Haining plant equipment may have been outmoded or ineffective. According to a Google-translated article in the Chinese press, as a result of the August 2011 pollution incident, JKS was required by authorities to update its equipment, specifically replacing its exhaust gas treatment device from a semi-automatic design to an

automatic design. (Link to Chinese news article: http://www.donews.com/ it/201109/614828.shtm).

121. On September 19, 2011, analyst Philip Shen with Roth Capital Partners echoed the Chinese article in the preceding paragraph, reporting that in the wake of the August 2011 environmental incident, JKS "must update all the waste and gas systems from half automated to fully-automated,..." Roth Capital was one of the underwriters for the May Offering.

122. After the market learned more about the true state of JKS environmental compliance, JKS shares fell on September 19, 2011 from $7.60 to $6.50 per share on unusually high volume.

123. Problems with JKS's equipment were also discussed on September 20, 2011, when *China News* reported that the Haining EPB, on September 18, 2011, issued a series of steps to be taken by JKS in order to improve at the Zhejiang plant. The reported measures included: improving disposal procedures, including expanding its emergency pool, improving its sewer network, surveying its emissions and upgrading treatment facilities; increasing the frequency of environmental monitoring with plant supervisors; and increasing interaction with local residents, allowing outsiders to supervise new measures put in place to prevent such an event from taking place again.

124. On September 20, 2011, *China News* also reported that in April 2011 the Haining EPB issued Zhejiang Jinko a "rectification notice" and in May conducted an investigation into the Company before later issuing an "administrative punishment".

125. Also on September 20, 2011, the *Los Angeles Times* published the following article:

Protesters get factory shut down

Jon Kaiman
BEIJING

Authorities ordered a solar panel manufacturing plant in eastern China to close after four days of protests by hundreds of villagers who have accused the facility of causing air and water pollution, Chinese media reported Monday.

The decision is an indication of the growing power of environmental protesters to sway government policy in China. As many as 500 villagers participated in the protests near Haining, an industrial city of 640,000 in coastal Zhejiang province.

The plant's operator, JinkoSolar, a New York Stock Exchange-listed company, also issued a public apology Monday.

**"We cannot shirk responsibility for the legal consequences which have come from management slips," Jing Zhaohui, a company spokesman, said at a news conference.**

Since the beginning of the protests, 20 people have been arrested on charges of destruction of property, robbery and disturbing public order, the Haining government said in a news release Monday. Protesters damaged eight company cars and four police cars Friday after police attempted to forcibly disperse the crowd, according to the release.

Protesters had demanded an explanation for a high volume of dead fish found last month in a nearby river. **Tests by the local environmental protection bureau found that the plant was releasing high levels of fluoride, which can be toxic if it exceeds certain levels. According to state media, the factory had been failing pollution tests since April.**

"Since they set up their operations here, there has definitely been an impact on the villagers here this pollution is definitely harmful to us," a local man told Reuters news service. State media also quoted villagers as complaining of harmful emissions from the factory's dozen smokestacks.

In addition to the order to halt production lines emitting potentially harmful waste, the government has also fined the plant about $74,000.

Chinese media have shown a surprising degree of audacity in reporting the incident. Reporters from a Zhejiang television station alleged that factory security guards attacked the production crew and destroyed a video camera. In response, the factory issued an on-air apology and promised to fire the security guards, who it said were "temporary employees." (Emphasis added).

126. As the market digested this news, JKS ADSs dropped another 9.4%, on September 20, 2011, falling to $5.89 per share. All told, in less than a week, investors lost over 40% of their investment when the market learned the truth about JinkoSolar's environmental problems that should have been disclosed earlier.

127. Throughout August and September, even during the protests on Thursday, September 15, 2011, JinkoSolar never bothered to issue a press release or file a Form 6-F to let investors know what was happening. Instead, the Company was striking secret deals to compensate local farmers, and appealing regulatory fines, issuing a press release on September 16, 2011 that JinkoSolar had become the San Francisco 49ers' sole "solar sponsor for the 2011-2012 season," and even managed to have *Gate F* at Candlestick Park rebranded as "JinkoSolar Gate" for the duration of the season.[2] Yet still no mention from the Company about the pollution, the fines, the fish, or the protests. It was not until the facility was stormed, ransacked, damaged and shut down that the Company even acknowledged the issue in the United States, issuing a brief press release on September 19, 2011. By that point, most of the damage to the share price had already been done.

## POST-CLASS PERIOD EVENTS

128. On September 22, 2011, the Company issued a lengthy follow-up press release in which it "suspected" that indeed JinkoSolar was the cause of the environmental contamination in August and September; finally conceded the April and May 2011 incidents (albeit in very general terms); and admitted to reaching an agreement with unnamed counterparties on September 7, 2011 to pay compensation for crop damage as well as for the death of any livestock and wildlife arising from the "pollution incident," as the Company called it. Separately, the

[2] In a twist of irony apparently lost on the Company, the September 16, 2011 press release even quoted the team as saying that the agreement "is a reflection of the San Francisco 49ers' dedication to promoting environmentally friendly practices."

Company apologized for the pollution, and apologized to the reporters who had been beaten up by JinkoSolar employees, calling the treatment "improper" and stating that the employees had been fired. However, the Company offered no explanation for its delay in disclosing all this information to investors.

129. The Company's remedial measures announced in September 2011 are similar to the remedial measures the Company itself had stated were necessary back in June 2010. According to JKS's Form 6-K, filed on September 22, 2011:

> First, we have isolated the affected water channel section and treated the affected water and soil. We also have built a water collection system around the warehouse and the extended outdoor storage area to prevent leakage. Additionally, we will construct a retaining wall to separate our facilities from the water channel, further preventing any accidental discharge into the water channel.

130. In addition, as noted, on September 18, 2011, the Haining EPB issued a series of steps to be taken by JKS in order to improve environmental compliance at the Zhejiang plant, including: improving disposal procedures and expanding its emergency pool, improving its sewer network, surveying its emissions and upgrading treatment facilities; increasing the frequency of environmental monitoring with plant supervisors; and increasing interaction with local residents, allowing outsiders to supervise new measures put in place to prevent such an event from taking place again.

131. Back in June 2010, the Company stated the following as means to solve the "existing" environmental compliance problems at or near the Zhejiang plant:

> To store sludge temporarily within the plant, permission must be sought with the Environmental Protection Administrative and Supervisory Department. **The company must also construct storage facilities in strict accordance with the "Standards for Pollution Control Relating to the Storage of Hazardous Waste" and apply strict anti-seep, anti-leakage measures in the temporary storage zone.** When cement for the flooring in the storage zone solidifies, drains should be installed to connect them to the adjustment pool. A

> rain shed should be constructed to prevent rain water from soaking into and seeping through into underground water and ground-level water, which could result in undesirable environmental consequences. The company should sub-contract the handling and treatment of the hazardous waste to a firm that is qualified to deal with it. This case of waste-handling should be reported to the Environmental Protection Administrative and Supervisory Department to enable the implementation of a tracking system and prevent secondary pollution and casual trading.

132. If the Company had properly effected the anti-leakage measures it discussed in June, 2010, it would not have had to "buil[d] a water collection system around the warehouse and the extended outdoor storage area to prevent leakage" after September 2011.

133. Likewise, if the Company had effected the anti-leakage measures discussed in June, 2010, the Haining EPB would not have had to require the Company to: improve disposal procedures, including expanding its emergency pool; improve its sewer network; survey its emissions and upgrade treatment facilities; increase the frequency of environmental monitoring with plant supervisors; and increase interaction with local residents, allowing outsiders to supervise new measures put in place to prevent such an event from taking place again. These facts certainly cast doubt on Defendants' compliance with PRC environmental laws and regulations throughout the Class Period.

134. Incredibly, in a conference call on September 22, 2011, the Company blamed the whole incident on JKS's waste management company stopping their removal of JKS's waste. However, JKS spokesman Rene Vanguestaine conceded the Company's responsibility – although in the most equivocal language imaginable:

> On August 20, the waste management company that was under contract to collect our solid waste every three days through June 4, 2012 stopped waste collection at our facilities. We immediately started to look for another licensed waste management company and,...promptly signed a contract on August 26...

> During this short period of time,...solid waste volume outgrew our warehouse and we started to store waste outside the warehouse in covered bins. We suspect that heavy rains on August 24 and 25 caused some waste to leak out to the nearby water channel via the drainage systems on the factory compound, which might be the cause of possible fluoride content that may have caused the death of the fish in the water channel.

135. In other words, JKS admitted it did not have enough emergency storage space to house 4 or 5 days worth of the Company's industrial waste (leaving little or no margin for error) – although, *inter alia*, the Company conceded existing environmental problems at the time of the IPO; repeatedly admitted that there was high fluoride content in the water near the Zhejiang Jinko plant; had two run-ins with the Haining EPB during the Class Period (April and May 2011); and the Company's environmental compliance was not "standardized" during the Class Period. *See* paragraphs 57-77; 114.

136. After the September 22, 2011 conference call, Susquehanna analyst Mehdi Hosseini asked the million dollar question in a September 22nd report – and this is assuming that the Company's story of a work stoppage is true – "[W]hy did JKS not have a contingency plan knowing the toxic nature of the material used and processed at this plant?" This question remains unanswered.

137. Moreover, JKS spokesmen Vanguestaine stated in the September 22nd conference call that the Company's registered waste disposal firm was contracted to remove solid waste every three days. Yet the Company only had storage room for four days of toxic waste. How JKS could leave such minuscule room for error when dealing with dangerous chemicals – especially when the Company was on notice of pervasive environmental compliance issues, particularly concerning fluoride waste – is unfathomable and, at the very least, severely reckless. This is particularly true in light of the Company's insistence on "timely collection removal" in the June 2010 EIA Report. *See* ¶ 62.

138. In addition to the media reporting on the recent pollution "incident," the riot in September gave voice to the local villagers who reported that JinkoSolar was not in compliance with PRC environmental regulations since the time of the IPO.

139. For example, New Tang Dynasty Television (NTDTV) interviewed local residents following the September 15-17, 2011 protest, who stated that JinkoSolar had been discharging polluted waste water into the river since moving to the Hongxiao Village in 2006.

140. One villager named Mr. Zhou told a reporter "we've been living in fear and been constantly lodging complaints regarding the pollution . . . ."

141. Another local resident, Mr. Guo, told a reporter that several years ago a number of young women working at the facility had become sterile and that young women planning to have families avoided working at the facility.

142. An unnamed official with Yuanua County, where Hongxiao Village is located, heard reports from villagers that they smelled a strong odor as the facility emits yellowish smoke between 1:00 a.m. and 3:00 a.m. each morning. He told this to the state-controlled China Daily media outlet.

143. There is also now an investigation into increased rates of cancer in the surrounding small village of 3,300 people. One blogger claimed that this village had unexplained and suspicious rates of cancer: six had leukemia, and 31 had other types of cancer. The blogger was promptly "detained" by the police for dissemination of "false information," but the Deputy Director of the Haining Health Bureau, quoted in JinkoSolar's own press release, confirms that even the official state-sanctioned number is not that different. Since 2007, 27 villagers had been diagnosed with cancer.

144. On September 28, 2011, a committee of experts established by the Haining government, approved a set of recommendations developed by PRC-licensed environmental engineering firms to be implemented by the Haining plant.

145. On October 7, 2011, the Company completed Phase 1 of its environmental safety upgrade in the wake of the August incident.

146. On October 11, 2011, the Company announced in a press release that it had resumed production at the Haining facility (Zhejiang Jinko) and "taken all the steps recommended by one of the top environmental engineering firms that is licensed by the Chinese government."

147. In light of the continued environmental violations throughout the Class Period, and the pervasive lack of disclosure to JKS shareholders, the following statement in the October 11th press release by Defendant Xiande Li is simply astounding:

> "While we have always been fully committed to environmental safety and social responsibility, we understand from this accident that we always need to think about extreme and unforeseen circumstances and generally enhance our risk management practices," commented Mr. Li Xiande, Chairman of JinkoSolar. "We will apply the lessons we have learned in all our production facilities for the benefit of the environment, the community and all our stakeholders."

148. The release then attempted to paint a happy face on the remedial measures – and said not a word about the Company's responsibility for the disaster:

> "We are expanding our outreach to the communities surrounding our production facilities. We have proposed regular meetings with Hongxiao Village officials to discuss issues of mutual interest," said Mr. Chen Kangping, Chief Executive Officer. "Additionally, we are finalizing our selection of an international environment, health and safety [EHS] company to perform a full scale audit of all our facilities. The management team decided to take this additional step as a testimony to the high international standards that we hold ourselves to. We believe that enhancing environmental performance and improving relationships with nearby communities will lead to increased shareholder value." [...]

On October 6, 2011, the Experts Committee, the Environmental Bureau of the Haining government and representatives of Hongxiao Village, reviewed the steps taken by the Company based on the recommendations of the Experts Committee and provided their comments to JinkoSolar's management.

On October 9, 2011, the Experts Committee notified the Company that it was satisfied with the steps taken by the Company.

The Company is waiting for a response from Hongxiao Village on its proposal for a regular schedule of meetings with village officials. The Company is deeply committed to going beyond symbolism to establish a greater understanding of how JinkoSolar and Hongxiao Village can better coexist and how the village can benefit from JinkoSolar's growth....

149. In the wake of the fish die-off in late August 2011, and the negative publicity surrounding JKS's environmental violations, JKS's breakneck growth was over. Indeed, in the Company's April 2012 Form 20-F for the year ended December 31, 2011, JKS disclosed that it had subsequently decided to cancel production expansion plans:

We originally planned to expand our annual production capacity for silicon wafers, solar cells and solar modules to 1.5 GW each by the end of 2011. However, in response to the changes in the market condition, we timely adjusted our expansion plan and plan to maintain our production capacity for these three products at our current level of 1.2 GW each. Instead of expanding our production capacity, we plan to focus on improving our efficiency to reduce our unit cost.

## LOSS CAUSATION / ECONOMIC LOSS

150. Defendants made materially false and misleading statements throughout the Class Period relating to environmental compliance, JKS's treatment of its waste products, and PRC environmental regulations. These false statements and omissions described above caused and maintained the artificial inflation of JinkoSolar's stock price throughout the Class Period until September 20, 2011.

151. Defendants false and misleading statements were also intended to cause, and did in fact cause, JinkoSolar's stock to trade at artificially inflated levels during the Class Period.

Over the week of September 15, 2011 through September 20, 2011, when the market slowly learned the truth of the Company's failure to comply with relevant environmental regulations, the value of JinkoSolar's ADSs fell by more than 40%.

## CLASS ACTION ALLEGATIONS

152. This is a class action pursuant to Rules 23(a) and (b)(3) of the federal Rules of Civil Procedure on behalf of a Class of all persons and entities who purchased or otherwise acquired JinkoSolar New York Stock Exchange-traded ADSs during the Class Period, either pursuant to or traceable to the May and/or November Offerings, or on the open market, and were damaged thereby. Excluded from the Class are (1) JinkoSolar, and its officers, directors, employees, affiliates, legal representatives, predecessors, successors and assigns, and any entity in which any of them have a controlling interest or are a parent; and (b) all Defendants, their immediate families, employees, affiliates, legal representatives, heirs, predecessors, successors and assigns, and any entity in which any of them has a controlling interest.

153. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period JinkoSolar shares traded on the NYSE under the ticker symbol "JKS." While the exact number of Class members is unknown to Plaintiffs at this time and can only be obtained through appropriate discovery, Plaintiffs believe that there are thousands of Class members located throughout the United States. Record owners and other members of the Class may be identified from records maintained by JinkoSolar and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

154. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. The questions of law and fact common to the Class include (1) whether Defendants violated the federal

securities laws, including the Exchange Act and Securities Act; (2) whether Defendants omitted and/or misrepresented material facts about environmental risk that were known and material; (3) whether the JinkoSolar Defendants knew or recklessly disregarded that their statements were false or misleading; (4) whether the market price of JinkoSolar ADSs was artificially inflated during the Class Period due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and (5) the extent to which members of the Class have sustained damages and the proper measure of any such damages.

155. Plaintiffs' claims are typical of the claims of other Class members, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law as complained of herein.

156. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel that is competent and experienced in class and securities litigation. Plaintiffs have no interest that is in conflict with, or otherwise antagonistic to the interests of the other Class members.

157. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in management of this action as a class action.

## SCIENTER ALLEGATIONS

158. These allegations pertain solely to claims alleged under the Exchange Act.

159. Defendants were motivated to commit fraud to ensure 1) the success of the Company's growth strategy; and 2) the success of their ADS and bond offerings, which were also connected to JKS's growth strategy.

### A. JKS's Paramount Need For Growth

160. JKS continually emphasized the importance of growth to the Company. For example, the May Prospectus stated that the Company had to continue to expand to succeed:

> ***Our failure to successfully execute our business expansion plans would have a material adverse effect on the growth of our sales and earnings.***
>
> Our future success depends, to a large extent, on our ability to increase vertical integration and expand our production capacity. We plan to increase our annual silicon wafer and solar module production capacity to approximately 500 MW each and annual solar cell production capacity to approximately 400 MW by the end of 2010. If we are unable to do so, we will not be able to achieve our goal of becoming a leading vertically integrated solar product supplier, attain the desired level of economies of scale in our operations or cut the marginal production cost to the level necessary to effectively maintain our pricing and other competitive advantages.

161. Similarly, on August 16, 2010, the Company issued a Form 6-K trumpeting its continued growth in solar cell manufacturing capacity.

> "We are pleased to have delivered strong growth in the second quarter and are excited to report our financial results for the first time as a public company," said Mr. Kangping Chen, JinkoSolar's chief executive officer. "During the quarter we achieved record shipments of approximately 100 MW, expanded our annual silicon wafer production capacity to 400 MW and annual solar cell and solar module production capacities to 300 MW each and significantly increased the vertical integration of our production process, which will improve our control over our manufacturing processes and costs across the value chain. Furthermore, our listing on the New York Stock Exchange in May has enhanced our brand name and provided us with additional resources and the platform to strive toward becoming a leading global solar company. As we look forward into the second half of the year, we expect to continue our strong momentum and we are well positioned to meet our established objectives in 2010."
>
> Mr. Longgen Zhang, JinkoSolar's chief financial officer, added, "We achieved excellent results this quarter across all financial metrics, with significant

increases in total revenues and net income, as well as significantly improved margins across the board on sequential and year-over-year basis. With significantly increased vertical integration, we should be able to continue driving down our average non-silicon cost by capitalizing on economies of scale. Our competitive advantage in cost-effective manufacturing combined with the resources and proceeds from our IPO position us strongly as we look to become a leader in the solar industry." [. . . ]

*Increased Integration and Capacity Expansion of Solar Products*

In the second quarter of 2010, the Company expanded annual solar cell and solar module manufacturing capacities from approximately 200 MW each as of March 31, 2010 to approximately 300 MW each as of June 30, 2010 and increased its vertical integration. [. . . ]

**Operations and Business Outlook**

*Third Quarter 2010 Guidance*

**The Company expects to increase its in-house annual silicon ingot, silicon wafer, solar cell and solar module production capacities to approximately 400 MW, 400 MW, 300 MW and 400 MW, respectively, by the third quarter of 2010.**

***Full Year 2010 Guidance***

**...The Company expects to expand its annual silicon ingot, silicon wafer, solar cell and solar module production capacities to approximately 500 MW each by the end of 2010.** (Emphasis added).

162. On February 28, 2011, Defendants filed a Form 6-K with the SEC further highlighting the Company's solar cell manufacturing growth:

*Capacity Expansion of Solar Products*

In the fourth quarter of 2010, the Company expanded its in-house annual silicon wafer, solar cell and solar module production capacities from approximately 600 MW, 300 MW and 450 MW, respectively, as of September 30, 2010, to approximately 600 MW, 600 MW and 600 MW, respectively, as of December 31, 2010. This compares to approximately 300 MW, 150 MW and 150 MW, respectively, as of December 31, 2009.

163. The Company also highlighted its need to expand its solar cell production in its April 25, 2011 Annual Report:

***Our failure to successfully execute our business expansion plans could have a material adverse effect on the growth of our sales and earnings.***

Our future success depends, to a large extent, on our ability to increase our vertical integration and expand our production capacity. As of December 31, 2010, we had annual silicon wafer, solar cell and solar module production capacity of approximately 600 MW each, and we expect to continue to expand our fully vertically-integrated solar module production capacity to reach 1.5 GW by the end of 2011. If we are unable to do so, or if we fail to achieve satisfactory manufacturing yields at higher production volumes, we will not be able to achieve our goal of becoming a leading vertically-integrated solar power product supplier, attain the desired level of economies of scale in our operations or cut our marginal production cost to the level necessary to effectively maintain our pricing and other competitive advantages.

## B. The Offerings

164. Defendants were also motivated to commit fraud to ensure the success of the various offerings the Company executed during the Class Period, including the May and November Offerings, as well as the $600 RMB (approximately $90 million) and $125 million debt offerings.

165. In the May Offering, certain JKS officers were granted over 700,000 shares of in-the-money options. *See* paragraphs 84-85.

166. In the November Offering, 300,000 JKS ADSs were offered by the three Company Founders (150,000 ADSs offered by Defendant Xiande Li, 90,000 by Defendant Kangping Chen, and 60,000 offered by Defendant Xianhua Li), including through various related entities. *See* paragraphs 88-89.

167. On January 13, 2011, the Company issued the following press release:

JinkoSolar Announces Registration of RMB 600 Million One-Year Short-Term Financing Bonds and Issuance of First Tranche of RMB 300 Million

SHANGHAI, China, January 13, 2011 – JinkoSolar Holding Co., Ltd. (NYSE: JKS) ("JinkoSolar" or the "Company"), a fast-growing vertically integrated solar product manufacturer with low-cost operations based in China, announced today that Jinko Solar Co., Ltd. ("Jiangxi Jinko"), one of the Company's wholly

owned subsidiaries, has successfully registered its plan to issue unsecured one-year short-term bonds with an aggregate principal amount of RMB 600 million (the "Registered Issue") with the PRC National Association of Financial Market Institutional Investors ("NAFMII"). The Company further announced that under the Registered Issue, Jiangxi Jinko issued unsecured short-term bonds with a principal amount of RMB 300 million on January 13, 2011 (the "First Tranche Issue").

The Registered Issue allows Jiangxi Jinko to issue RMB-denominated unsecured one-year short-term bonds in two tranches on the PRC inter-bank bond market. The First Tranche Issue was issued on January 13, 2011, and will mature on January 14, 2012. The First Tranche Issue bears a fixed annual interest rate of 5.28%, lower than the current benchmark one-year lending rate of 5.81%. The second tranche with a principal amount of RMB 300 million (the "Second Tranche Issue") is expected to be issued from February to December in 2011.

Industrial Bank acted as the lead underwriter and bookrunner for the First Tranche Issue with standby commitment. Approximately 83% of the proceeds will be used as working capital, and the remaining 17% will be used to repay bank loans of higher interest rates.

168. On March 24, 2011, Defendants filed a Form 6-K with the SEC which stated, in pertinent part:

**JinkoSolar Announces Issuance of Second Tranche of One-Year Short-Term Financing Bonds of RMB300 Million**

SHANGHAI, China, March 24, 2011 – JinkoSolar Holding Co., Ltd. (NYSE: JKS) ("JinkoSolar" or the "Company"), a fast-growing vertically integrated solar product manufacturer with low-cost operations based in China, announced today that Jinko Solar Co., Ltd. ("Jiangxi Jinko"), one of the Company's wholly owned subsidiaries, successfully issued unsecured short-term bonds with a principal amount of RMB300 million (the "Second Tranche Issue") pursuant to its plan to issue unsecured one-year short-term bonds with an aggregate principal amount of RMB600 million (the "Registered Issue") with the PRC National Association of Financial Market Institutional Investors ("NAFMII"), which was previously announced on January 13, 2011.

The Second Tranche Issue was issued on March 22, 2011, and will mature on March 23, 2012. The Second Tranche Issue bears a fixed annual interest rate of 5.6%, lower than the current benchmark one-year lending rate of 6.1%. The First Tranche with a principal amount of RMB300 million was issued on January 13, 2011.

Industrial Bank acted as the lead underwriter and bookrunner for the Second Tranche Issue with standby commitment. Approximately 83% of the proceeds

will be used as working capital, and the remaining 17% will be used to repay bank loans of higher interest rates....

Mr. Longgen Zhang, chief financial officer of JinkoSolar, commented, "We are pleased to issue the second tranche early in the year, locking down a promisingly favorable interest rate as we expect China's lending interest rate to continue to rise against inflation. The issuance of our short-term bonds further illustrates the market affirmation of our strong performance as well as investor's confidence in our ability to continue to deliver positive results in the year to come."

169. The April 2011 Annual Report also discussed JKS's rapid growth and further emphasized that the bond offerings were imperative to fuel the Company's growth:

*Major Plans to Construct, Expand or Improve Facilities*

We have rapidly expanded our operations from the processing of recoverable silicon materials to the production of silicon ingots and silicon wafers and further to the production of solar cells and solar modules.

As of December 31, 2010, we had annual silicon wafer, solar cell and solar module production capacity of approximately 600 MW each and achieved fully vertically-integrated solar module production. We plan to expand our fully vertically-integrated solar module production capacity to reach 1.5 GW by the end of 2011. We plan to continue to increase our investment in manufacturing facilities, equipment and land use rights to accommodate our planned increase in annual silicon ingots, silicon wafer, solar cell and solar module production capacity in 2011. In connection with our expansion plan through the end of 2011, we expect that the estimated amount of expenditure will be approximately RMB 2.3 billion, of which RMB665.8 million (US$100.9 million) was already paid as of December 31, 2010.

We issued two tranches of RMB-denominated unsecured one-year short-term bonds with an aggregate principal amount of RMB600 million with the PRC National Association of Financial Market Institutional Investors, or NAFMI. The first tranche was issued on January 13, 2011 with a principal amount of RMB300 million (US$45.5 million), bearing interest at the fixed rate of 5.28% per annum, and will mature on January 14, 2012. For the first tranche, approximately 83% of the proceeds will be used as working capital and the remaining 17% will be utilized for the prepayment of bank loans of higher interest rates. The second tranche was issued on March 22, 2011 with a principal amount of RMB300 million (US$45.5 million), bearing interest at the fixed rate of 5.60% per annum, and will mature on March 23, 2012. For the second tranche, all the proceeds will be used as working capital.

On March 31, 2011, we obtained two syndicated loans with an aggregate principal amount of RMB600 million (US$91.0 million) from a group of PRC banks, of which RMB200 million (US$30.3 million) will be used as working capital and another RMB400 million (US$60.6 million) will be used to fund our construction projects. These loans are collateralized with Zhejiang Jinko's land use rights and equipment and guaranteed by Jiangxi Jinko.

We believe that our current cash, cash equivalents, short-term and long-term borrowings and anticipated cash flow from operations will be sufficient to meet our anticipated cash needs for the next 12 months, including our cash needs for working capital and capital expenditures. We may, however, require additional cash due to changing business conditions or other future developments, including any investments or acquisitions we may decide to pursue. If our existing cash is insufficient to meet our requirements, we may seek to sell additional equity or debt securities or borrow from banks.

170. On May 11, 2011, the Company issued a Form 6-K announcing a further bond offering. The Company also stated, *inter alia*, that the offering was needed to fuel the Company's continued growth, including growth in solar cell manufacturing capacity:

**JinkoSolar Announces Proposed Offering of US$125 Million Convertible Senior Notes**

**SHANGHAI, China, May 11, 2011** – JinkoSolar Holding Co., Ltd. (the "Company") (NYSE: JKS), a fast-growing, vertically-integrated solar power product manufacturer with low-cost operations based in China, today announced its plans to issue, subject to market and other conditions, US$125 million in aggregate principal amount of convertible senior notes due 2016 (the "notes"). The notes will be sold to qualified institutional buyers pursuant to Rule 144A under the Securities Act of 1933, as amended (the "Securities Act"). The Company expects to grant the initial purchasers a 30-day option to purchase up to US$25 million principal amount of additional notes to cover over-allotments, if any. The terms and timing of the offering have not been finalized.

**The Company will use a portion of the proceeds of the offering to pay for the capped call and associated expenses described below. The Company intends to use the remaining net proceeds from the offering for expansion of its silicon wafer, solar cell and solar module production capacity.**

171. On May 17, 2011, Defendants announced the closing of its offering of US$125 million in aggregate principal amount of convertible senior notes due 2016 in a Form 6-K.

172. On July 11, 2011, the Company announced that JKS had successfully registered and issued unsecured one-year short-term bonds with an aggregate principal amount of RMB400 million with the PRC National Association of Financial Market Institutional Investors ("NAFMII").

## COUNT I

## VIOLATIONS OF SECTION 11 OF THE SECURITIES ACT AGAINST ALL DEFENDANTS

173. Plaintiffs repeat and reallege each and every allegation contained in each of the foregoing paragraphs as if set forth fully herein, to the extent such allegations do not allege fraud or the intent to defraud Plaintiffs or members of the Class.

174. This Count does not sound in fraud. Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count. For purposes of asserting this claim under the Securities Act, Plaintiffs do not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a § 11 claim.

175. This Count is asserted against all Defendants for violations of § 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all Class members who purchased or otherwise acquired JinkoSolar's ADSs pursuant or traceable to the May or November Prospectuses.

176. Defendants' liability under this Count is predicated on the participation of each Defendant in conducting the May and November Offerings pursuant to the May and November Registration Statements, which contained misrepresentations of material fact.

177. The May and November Registration Statements contained untrue statements of material fact and omitted other facts necessary to make the statements not misleading, and failed to disclose material facts as described above. The Individual Defendants were executive officers and representatives of the Company who were responsible for the contents and dissemination of

the May and November Prospectuses. Further, the Individual Defendants signed the May and November Prospectuses in their official capacity with the Company.

178. The Underwriter Defendants were underwriters for the May and/or November Offerings. As such, these Defendants issued, caused to be issued and participated in the issuance of the May and November Prospectuses and are subject to liability for violations of § 11 of the Securities Act.

179. Plaintiffs and the other Class members who acquired the ADSs pursuant or traceable to the May and/or November Prospectuses did not know of the false statements and omissions alleged herein and could not have reasonably discovered such facts or conduct.

180. Less than one year elapsed from the time Plaintiffs discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that the first complaint was filed asserting claims arising out of the falsity of the May or November Prospectuses. Less than three years elapsed from the time that the securities upon which this Count is brought were offered to the public to the time that the first complaint was filed asserting claims arising out of the falsity of the May or November Prospectuses.

181. Plaintiffs and the other Class members have sustained damages. The value of JinkoSolar ADSs have declined substantially subsequent to and due to Defendants' violations of § 11 of the Securities Act. By reason of the foregoing, Defendants are liable for violations of § 11 of the Securities Act to Plaintiffs and the other Class members who purchased or otherwise acquired JinkoSolar's ADSs pursuant or traceable to May or November Prospectuses.

**COUNT II**

**VIOLATIONS OF SECTION 12(a)(2) OF THE SECURITIES ACT AGAINST JINKOSOLAR, THE UNDERWRITER DEFENDANTS, AND INDIVIDUAL DEFENDANTS CHEN, XIANDE LI, AND XIANHUA LI**

182. Plaintiffs repeat and reallege each and every allegation contained in each of the foregoing paragraphs as if set forth fully herein, to the extent such allegations do not allege fraud or the intent to defraud Plaintiffs or members of the Class.

183. The defendants named in this Count violated § 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2). This Count is alleged on behalf of all Class members who purchased or otherwise acquired the JinkoSolar ADSs pursuant or traceable to the May and/or November Offerings.

184. This Count does not sound in fraud. Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count. For purposes of asserting this claim under the Securities Act, Plaintiffs do not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a § 12(a)(2) claim.

185. The defendants named in this count were sellers, offerors and/or solicitors of sales of the ADSs offered pursuant to the May and/or November Prospectuses. These offering documents contained untrue statements of material fact and omitted other facts necessary to make the statements not misleading, and failed to disclose material facts, as set forth above.

186. Plaintiffs and the other Class members who purchased or otherwise acquired ADSs pursuant or traceable to the materially untrue and misleading offering documents did not know or, in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the May and/or November Prospectuses.

187. The Defendants named in this count owed to Plaintiffs and the other Class members who purchased or otherwise acquired ADSs pursuant or traceable to the materially false and misleading offering documents the duty to make a reasonable and diligent investigation of the statements contained in the offering documents, to ensure such statements were true and that there was no omission of material fact necessary to prevent the statements contained therein from being misleading. The defendants named in this count did not make a reasonable investigation or possess reasonable grounds to believe that the statements contained in the offering documents were true and without omissions of any material facts and were not misleading. By virtue of the conduct alleged herein, the defendants named in this count violated § 12(a)(2) of the Securities Act.

**COUNT III**

**VIOLATIONS OF SECTION 15 OF THE SECURITIES ACT**
**<u>AGAINST THE INDIVIDUAL DEFENDANTS</u>**

188. Plaintiffs repeat and reallege each and every allegation contained in each of the foregoing paragraphs as if set forth fully herein, to the extent such allegations do not allege fraud or the intent to defraud Plaintiffs or members of the Class. This Count is asserted against the Individual Defendants for violations of § 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of Plaintiffs and the other Class members who purchased or otherwise acquired JinkoSolar's ADSs pursuant or traceable to the May and/or November Prospectuses.

189. This Count does not sound in fraud. Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count. For purposes of asserting this claim under the Securities Act, Plaintiffs does not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a § 15 claim.

190. At all relevant times, the Individual Defendants were controlling persons of the Company within the meaning of § 15 of the Securities Act. Each of the Individual Defendants served as an executive officer or director of JinkoSolar prior to and at the time of the May and/or November Offerings, as set forth above.

191. Each of the Individual Defendants at all relevant times participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of JinkoSolar's business affairs. As officers and directors of a publicly owned company listed on the NYSE and registered with the SEC, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to JinkoSolar's financial condition and results of operations.

192. In addition, Defendants Xiande Li, Kangping Chen and Xianhua Li beneficially own approximately 23.2%, 13.9% and 9.3% of the outstanding ordinary shares of the Company, respectively, and thus the most recent Form 20-F disclosed that:

> If the founders act collectively, ***they will have substantial control over our business***, including decisions regarding mergers, consolidations and the sale of all or substantially all of our assets, election of directors, dividend policy and other significant corporate actions. They may take actions that are not in the best interest of our company or our securities holders. For example, this concentration of ownership may discourage, delay or prevent a change in control of our company, which could deprive our shareholders of an opportunity to receive a premium for their shares as part of a sale of our company and might reduce the price of our ADSs. (Emphasis added.)[3]

193. By reason of the aforementioned conduct, each of the Defendants named in this Count are liable under § 15 of the Securities Act, jointly and severally with, and to the same extent as the Company is liable under §§ 11 and 12(a)(2) of the Securities Act, to Plaintiffs and

[3] The bizarre disclosure in the quote above that the Founders "may take actions that are not in the best interest of our company or our securities holders" is seemingly contradicted by a disclosure elsewhere in the Form 20-F that JinkoSolar directors "have a common law duty of loyalty to act in good faith in their dealings with or on behalf of the company."

the other Class members who purchased securities pursuant or traceable to the May or November Offerings.

**PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET**

194. At all relevant times, the market for JinkoSolar ADSs was an efficient market for the following reasons, among others: (1) the ADSs were listed and actively traded on the NYSE, a highly efficient market; (2) as a regular issuer of ADSs, ordinary shares and various publicly traded debt instruments, JinkoSolar filed periodic public reports on Form 20-F and Form 6-F with the SEC; (3) JinkoSolar regularly issued press releases that were carried by the national news wires, were publicly available and entered the public marketplace.

195. As a result, the market for the ADSs promptly digested current information regarding JinkoSolar from all publicly available sources and reflected such information in JinkoSolar's stock price.

196. Under these circumstances, all purchasers of the ADSs during the Class Period suffered similar injury through their purchases of stock at artificially inflated prices and a presumption of reliance applies.

**COUNT IV**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against the JinkoSolar Defendants**

197. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

198. During the Class Period, the JinkoSolar Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase JinkoSolar ADSs at artificially

inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

199. The JinkoSolar Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for JinkoSolar securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All JinkoSolar Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

200. These defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about JinkoSolar's failure to comply with Chinese environmental regulations, as specified herein.

201. These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of JinkoSolar's ostensible commitment to "green" technologies and a commitment to compliance with all environmental regulations, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about JinkoSolar and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein,

and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

202. Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's periodic disclosures to investors; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's compliance with environmental regulations at all relevant times; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

203. The JinkoSolar Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing JinkoSolar's failure to comply with Chinese environmental regulations from the investing public and supporting the artificially inflated price of its securities. As demonstrated by the allegations above, these defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were

reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

204. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of the ADSs was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by these Defendants, or upon the integrity of the market in which the securities trade, and/or in the absence of material adverse information that was known to or recklessly disregarded by these defendants, but not disclosed in public statements by these defendants during the Class Period, Plaintiffs and the other members of the Class acquired the ADSs during the Class Period at artificially high prices and were damaged thereby.

205. At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding JinkoSolar, which was not disclosed by these Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired the ADSs, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

206. By virtue of the foregoing, these Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

207. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the ADSs during the Class Period.

## COUNT V

### Violation of Section 20(a) of the Exchange Act Against the Individual Defendants

208. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

209. The Individual Defendants acted as controlling persons of JinkoSolar within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiffs contend are false and misleading. These Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

210. In addition, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

211. Furthermore, Defendants Xiandi Li, Kangping Chen and Xianhua Li beneficially own approximately 23.2%, 13.9% and 9.3% of the outstanding ordinary shares of the Company, respectively, and thus the most recent Form 20-F disclosed that:

> If the founders act collectively, ***they will have substantial control over our business***, including decisions regarding mergers, consolidations and the sale of all or substantially all of our assets, election of directors, dividend policy and other significant corporate actions. They may take actions that are not in the best interest of our company or our securities holders. For example, this concentration of ownership may discourage, delay or prevent a change in control of our company, which could deprive our shareholders of an opportunity to receive a premium for their shares as part of a sale of our company and might reduce the price of our ADSs. (Emphasis added.)

212. As set forth above, the Individual Defendants each violated Section 10(b) and Rule l0b-5 by their acts and/or omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the ADSs during the Class Period.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

B. Determining that this action is a proper class action and certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

C. Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

D. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E. Awarding such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

Dated: New York, New York
June 1, 2012


**BERNSTEIN LIEBHARD LLP**

U. Seth Ottensoser /KSG

Sandy A. Liebhard (liebhard@bernlieb.com)
U. Seth Ottensoser (ottensoser@bernlieb.com)
Joseph R. Seidman, Jr.
(seidman@bernlieb.com)
10 East 40th Street
New York, New York 10016
Tel: (212) 779-1414
Fax: (212) 779-3218

**ZAMANSKY & ASSOCIATES, LLC**

Jacob H. Zamansky
Edward H. Glenn, Jr.
Kevin D. Galbraith
50 Broadway, 32nd Floor
New York, New York 10004
Tel.: (212) 742-1414
Fax: (212) 742-1177

**Co-Lead Counsel for Lead Plaintiffs and the Proposed Class**

# EXHIBIT A

**CERTIFICATION OF NAMED PLAINTIFF**
**PURSUANT TO FEDERAL SECURITIES LAWS**

RONALD D. SNYDER MD ("PLAINTIFF"), declares the following as to the claims asserted under the federal securities laws:

1. Plaintiff has reviewed the complaint filed in this matter and has authorized the filing of a complaint based on similar allegations in a related or amended complaint. Plaintiff retains Bernstein Liebhard LLP and such counsel they deem appropriate to associate with to pursue such action.

2. Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in this private action.

3. Plaintiff is willing to serve as a lead plaintiff either individually or as part of a group. A lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial. I understand that the litigation is not settled, this is not a claim form, and sharing in any recovery is not dependent upon execution of this Certification.

4. Plaintiff's transaction(s) in the **JINKOSOLAR, LTD.** security that is the subject of this action during the class period are as follows:

| No. of Shares | Stock Symbol | Buy/Sell | Date | Price Per Share |
|---|---|---|---|---|
| 345 | JKS | BUY | 2/25/2011 | 28.9875 |
| 300 | JKS | BUY | 11/18/2010 | 25.31 |
| 1000 | JKS | BUY | 10/28/2010 | 30.21 |

**Please list other transactions on a separate sheet of paper, if necessary.**

5. Plaintiff has been appointed to serve as a representative party for a class in the following actions filed under the federal securities laws during the three years prior to the date of this Certification:

6. Plaintiff is not currently seeking to serve as a representative party for a class in any actions filed under the federal securities laws.

7. Plaintiff initially sought to serve as a representative party for a class in the following actions filed under the federal securities laws during the three years prior to the date of this Certification:

8. The undersigned is authorized to sign this Certification on behalf of Plaintiff.

9. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, or as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _7_th day of November, 2011.

[signature]
Signature

Ronald D. Snyder MD
Print Name