UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                                             :
MARCO PETERS, Individually and on Behalf of                  :
All Others Similarly Situated,                               :
                                                             :
                                      Plaintiff,             :        11 Civ. 7133 (JPO)
                                                             :
                     -against-                               :        MEMORANDUM AND
                                                             :             ORDER
JINKOSOLAR HOLDING CO., LTD., XIANDE                         :
LI, KANGPING CHEN, XIANHUA LI, WING                          :
KEONG SLEW, HAITAO JIN, ZIBIN LI,                            :
STEVEN MARKSCHEID, LONGGEN ZHEN,                             :
CREDIT SUISSE SECURITIES (USA) LLC,                          :
OPPENHEIMER & CO. INC., ROTH CAPITAL                         :
PARTNERS, LLC, WILLIAM BLAIR & CO. and                       :
COLLINS STEWART LLC,                                         :
                                                             :
                                      Defendants.            :
                                                             :
-------------------------------------------------------------X

J. PAUL OETKEN, District Judge:

Vaughn Leroy Meyer, Richard Matkevich, Abdullah al-Mahmud, and Azriel Shusterman

("Lead Plaintiffs" or "Plaintiffs") bring this action individually and on behalf of all persons and

entities that acquired Jinkosolar Holding Co., LTD. ("Jinkosolar" or "the Company") New York

Stock Exchange-traded American Depository Shares ("ADS") between May 13, 2010 and

September 20, 2011 ("the Class Period").  Plaintiffs sue, *inter alia*, Jinkosolor, alleging

violations of Sections 10(b) and 20 of the Securities Exchange Act of 1934 ("the Exchange

Act"), as well as Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 ("the Securities

Act").  Various Defendants now move to dismiss Plaintiffs' action, pursuant to Rules 12(b)(6)

and 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act

of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b).

For the reasons that follow, Defendants' motions to dismiss are granted, and Plaintiffs' action is dismissed.

## I.      Background

### A.      Factual Background

The following facts are taken from Plaintiffs' Amended Complaint (Dkt. No. 57 ("Am. Compl.")) and are presumed true for purposes of this motion.

Jinkosolar is a manufacturer of solar technology products with operations based in Jiangxi and Zhenjiang Providence in China.  It is one of the world's largest manufacturers of photovoltaic ("PV") products.   Jinkosolar was initially in the business of producing silicon wafers and solar modules, but after acquiring Zhejiang Sun Valley Energy Application Technology Co., Ltd. ("Sun Valley") in 2009, it rapidly expanded its production of solar cells. To facilitate its growth, Jinkosolar decided to go public; its initial public offering ("IPO") on the New York Stock Exchange occurred on May 13, 2010 ("the May offering").  There was a second public offering of Jinkosolar stock on November 4, 2012 ("the November offering").

### 1.      Environmental Problems and Investors' Discovery

Concomitant with Jinkosolar's rapid growth were troubling environmental missteps.   In June 2010, Jinkosolar submitted a report to the Haining Environmental Protection Bureau ("the EBP") concerning the Company's "existing problem" with disposing of hazardous waste in the appropriate manner and with emitting high levels of fluorides.  Jinkosolar submitted additional reports to the EPB in February and July of 2011, both of which discussed the high levels of fluorides in the Zhenjiang plant.  The EPB also informed Jinkosolar of high levels of fluorides in the water in April and May of 2011: In April, Jinkosolar received a "pre-trial production notice"

from the EPB stating that high levels of fluoride had been detected in Jinkosolar's waste;[1] the

next month, the EPB reported high levels of fluoride in the waste water.

None of these correspondences—nor the environmental woes discussed therein—were

disclosed to shareholders until late September, when a kerfuffle at the Zhenjiang plant forced

Jinkosolar's hand.  In August 2011, residents living near the Zhenjiang became alarmed about

the large scale die-off of fish and the contamination of adjacent land.  By no later than September

7, 2011, Jinkosolar appears to have tacitly acknowledged to the residents, but not to its

shareholders, that it was responsible for the pollution and would reimburse locals for crop

damage and livestock deaths. On September 15, 2011, news outlets began to report on hundreds

of locals demonstrating outside Jinkosolar's Zhenjiang plant.   These protests lasted until

September 18, 2011, and galvanized a wave of revelations about Jinkosolar's environmental

record in the Zhenjiang plant.

On September 19, 2011, Jinkosolar issued a press release explaining that it had

"suspended operations at its facility in Haining." (Am. Compl. at ¶ 117.)  The press release also

admitted that "[a]n initial investigation conducted by the local environmental protection

authority indicates that the pollution may have been caused by the improper storage of waste

containing fluoride." (*Id*.)  News stories published from September 18 to September 20, 2011

detailed the EPB's past concerns about the Zhenjiang plant.  In a follow-up press release dated

September 22, 2011, Jinkosolar admitted that it had received notification that its fluoride levels

were too high as early as May 2011.

---

[1] Defendants deny that this "pre-trial production notice" implicates Jinkosolar in any way.
However, in stories on the protests, several news outlets reported that "[a]ccording to [Chinese]
state media, the factory has been failing pollution tests since April [2011]."  (Am. Compl. at ¶
125; *see also id.* at ¶ 113.)

From September 15, 2011 to September 20, 2011, as the news of the protests and the company's history of environmental woes trickled out, Jinkosolar shares dropped from $10.02 per share to $5.89 per share.  In other words, Jinkosolar was worth 41% less on September 20 than it is was less than a week before.

### 2.     Jinkosolar's Statements to Investors

As explained *supra*, Jinkosolar's environmental woes began not long after its IPO in May 2010, but investors were not informed of any of the problems with the Zhenjiang plant until September 19, 2011.

In its May 2010 Prospectus, Jinkosolar stated that

> [Jinkosolar has] installed pollution abatement equipment at our facilities to process, reduce, treat, and where feasible, recycle the waste materials before disposal, and we treat the waste water, gaseous and liquid waste and other industrial waste produced during the manufacturing process before discharge.  We also maintain environmental teams at each of our manufacturing facilities to monitor waste treatment and ensure that [these] waste emissions comply with PRC [People's Republic of China] environment standards.  Our environmental teams are on duty 24 hours.  We are required to comply with all PRC national and local environmental protection laws and regulations.

The Prospectus also stated:

> *Compliance with environmental, safe production and construction regulations can be costly, while non-compliance with such regulations may result in adverse publicity and potentially significant monetary damages, fines and suspension of our business operations.*
>
> We use, store and generate volatile and otherwise dangerous chemicals and wastes during our manufacturing process, and are subject to a variety of government regulations related to the use, storage and disposal of such hazardous chemicals and waste.  We are required to comply with all PRC national and local environmental regulations.

(Emphasis in original.)  The November Prospectus, the 2010 year-end report (issued May 2011), and the amended 2012 year-end report (issued September 2, 2011) contain similar language.  No other environment-related information was provided through shareholders by any other means, until late September 2011.

### 3.    The Other Defendants

Plaintiffs have sued, in addition to Jinkosolar, the underwriters of the two public offerings under the Securities and Exchange Acts.  The underwriters for the May offering were Credit Suisse Securities (USA) LLC ("Credit Suisse"), Oppenheimer & Co., Inc. ("Oppenheimer"), Roth Capital Partners, LLC ("Roth Capital Partners"), and Collins Stewart LLC ("Collins Stewart").  The underwriters for the November offering were Credit Suisse, William Blair, Roth Capital Partners, and Collins Stewart.

There are also eight individual defendants named in this action ("the Individual Defendants").  Xiande Li, Xianhua Li, and Kangping Chen are the co-founders of Jinkosolar. They were the Chairman of the Board, the Vice-President, and the CEO of Jinkosolar, respectively, during the class period.  Longgen Zheang is a US-certified public accountant, and was the CFO of Jinkosolar during the class period.  Wing Keon Siew, Haitao Jin, Zibin Li, and Steven Marscheid were all Directors during the entirety of the class period.  All Individual Defendants signed both the May and November Prospectuses.  The Individual Defendants are sued under, *inter alia*, Section 20(a) of the Exchange Act and Section 15 of the Securities Act.

### 4.    The Lead Plaintiffs

There are four Lead Plaintiffs in this action: Vaughn Leroy Meyer, Richard Matkevich, Abdullah al-Mahmud, and Azriel Shusterman.[2]  Together, the four Lead Plaintiffs suffered a loss

---

[2] On March 19, 2012, this Court considered several competing motions for appointment as lead plaintiff.  It was determined that these plaintiffs would be appointed Lead Plaintiffs and that

of $515,526.69 from their investments in Jinkosolar.  (*See* Dkt. No 38 at 3.)  Richard Matkevich

and Ronald Snyder purchased Jinkosolar ADS on November 3, 2010 and October 28, 2012,

respectively.  They allege that their purchases of ADS are traceable to the May Prospectus.

Abdullah al-Mahmud bought Jinkosolar ADS on November 4, 2010 and alleges that his purchase

is traceable to the November Prospectus.

### B.    Procedural Background

Plaintiffs filed an initial complaint on October 11, 2011.  (Dkt. No. 1.)  It was amended

by Plaintiffs on June 1, 2012.  (Am. Compl.)  On August 1, 2012, Jinkosolar moved to dismiss

the Amended Complaint.  (Dkt. No 63 ("Jinkosolar Mem.").)  That same day, Defendants Credit

Suisse, Oppenheimer, Roth Capital Partners, and Collins Stewart (together, "the Underwriter

Defendants") joined Jinkosolar's motion to dismiss.  (Dkt. No 67 ("Underwriter Mem.").)

Steven Markscheid also moved to dismiss the Amended Complaint on August 1, 2012.  (Dkt.

No. 66 ("Markscheid Mem.").)  Plaintiffs opposed these motions in an omnibus motion on

September 27, 2012.  (Dkt. No. 70  ("Pls.' Opp'n.").)  Jinkosolar and Markscheid replied on

November 7, 2012.  (Dkt. Nos. 72-73.)  The Underwriter Defendants replied on November 8,

2012.  (Dkt. Nos. 74.)

## II.    Discussion

### A.    The Exchange Act Claims

Plaintiffs bring a Section 10(b) claim against Jinkosolar and a Section 20(a) claim against

the Individual Defendants.  Because there can be no "control person" liability under Section

20(a) unless there was a "primary violation" of the Exchange Act, *Wilson v. Merrill Lynch &*

*Co., Inc.*, 671 F.3d 120, 139 (2d Cir. 2011) (citing *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450,

---

Bernstein Liebhard LLP and Zamansky & Associates, LLC would be co-lead counsel for the
class.  (Dkt. No. 52.)

1472 (2d Cir. 1996)), this Court will focus its initial inquiry on the alleged violation of Section

10(b) and Rule 10b-5.

In its motion to dismiss, Jinkosolar argues that Plaintiffs have not adequately met their

burden under the PSLRA, and that Plaintiffs' Section 10(b) claim must therefore fail as a matter

of law.  More specifically, Jinkosolar claims that Plaintiffs' amended complaint (a) has failed to

alleged any actionable misstatements or omissions, (b) does not plead scienter, and (c) does not

plead loss causation.

### 1.    Legal Standard

As a general rule, when deciding a motion to dismiss pursuant to Federal Rule of Civil

Procedure 12(b)(6), a court is obliged to "accept as true all of the factual allegations contained in

the complaint," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 572 (2007), drawing "all

inferences in the light most favorable to the non-moving party's favor." *In re NYSE Specialists*

*Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007) (citation omitted).  Moreover, courts deciding motions

to dismiss are "not limited to the face of the complaint," and "may [also] consider any written

instrument attached to the complaint, statements or documents incorporated into the complaint

by reference, legally required public disclosure documents filed with the SEC, and documents

possessed by or known to the plaintiff and upon which it relied in bringing the suit." *In re*

*Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 382 (S.D.N.Y. 2007) (citations omitted).

While Federal Rule of Civil Procedure 8(a) requires only a "short and plain statement of

the claim showing that the pleader is entitled to relief" Fed. R. Civ. P. 8(a)(2), it is well settled

that the complaint must do more than plead facts that "do not permit the court to infer more than

the mere possibility of misconduct." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  In other

words, in order to properly state a claim and avoid dismissal, a plaintiff must state "the grounds

upon which his claim rests through factual allegations sufficient 'to raise a right to relief above

the speculative level.'" *ATSI Comm., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)

(quoting *Twombly*, 550 U.S. at 546).  At bottom, to survive a motion to dismiss, a plaintiff's

facts must give rise to a plausible narrative supporting his claim.  *See Twombly*, 550 U.S. at 570

("Here, in contrast, we do not require heightened fact pleading of specifics, but only enough facts

to state a claim to relief that is plausible on its face. Because the plaintiffs here have not nudged

their claims across the line from conceivable to plausible, their complaint must be dismissed.").

Moreover, under the PSLRA's heightened pleading standard and Federal Rule of Civil

Procedure 9(b), any private securities complaint alleging that the defendant made a false or

misleading statement must: (1) "specify each statement alleged to have been misleading [and]

the reason or reasons why the statement is misleading," and (2) "state with particularity facts

giving rise to a strong inference that the defendant acted with the required state of mind."

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007) (citing 15 U.S.C. § 78u–

4(b)(1)-(2)).

In order to adequately plead a Section 10(b) violation, a plaintiff must show "(1) a

material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between

the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the

misrepresentation or omission; (5) economic loss; and (6) loss causation."  *Stoneridge Inv.*

*Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008) (citing *Dura Pharmaceuticals, Inc.*

*v. Broudo*, 554 U.S. 336, 341-42 (2005)).

Under the heightened pleading standard mandated by the PSLRA, a private securities

complainant alleging that a defendant made a false or misleading statement must show that the

defendant "made an untrue statement of a material fact" or that it "omitted to state a material fact

necessary in order to make the statement made, in the light of the circumstances in which they

were made, not misleading."  15 U.S.C. § 78u–4(b)(1).  If the plaintiff contends that the

defendant has made material misstatements, the plaintiff must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." *Id.*

Even if no misstatements took place, Plaintiffs can meet their burden under § 78u–4(b)(1) by adequately pleading a material omission. The Second Circuit has explained that "an omission is actionable only if: (a) the omitted fact is material; and (b) the speaker had a duty to disclose the omitted fact." *In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 560 (S.D.N.Y. 2011) (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)); *see also In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993) ("[A]n omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts." (citations omitted).) An omission is "material" only if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc.*, 485 U.S. at 231-32 (1988) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)); *see also In re Time Warner Inc. Sec. Litig.*, 9 F.3d at 267-68 (explaining that, when omission makes a prior statement misleading, "the inquiries as to duty and materiality coalesce"). However, because the question of "materiality of an omission is a mixed question of law and fact, courts often will not dismiss a securities fraud complaint at the pleading stage of the proceedings, unless reasonable minds could not differ on the importance of the omission." *Halperin v. eBankerUSA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002); *see also Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985) (holding that neither dismissal nor summary judgment is proper on "the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance"). This "total mix" includes not just any possible misstatements, but also any "cautionary language" that might have made it unreasonable for an investor to be misled. *Halperin*, 295 F.3d at 357.

### 2.      Jinkosolar's Alleged Violations of the Exchange Act

As explained *supra*, Plaintiffs have located three paragraphs in the May Prospectus—and

repeated elsewhere—that Plaintiffs allege constitute material misstatements.  Plaintiffs further

allege that the environment-related information provided in the Prospectuses, while perhaps

literally true, is false by omission.  Meanwhile, Defendants contend that all of the environment-

related statements made in the Prospectuses are factually correct, and that, even if it were true

that Defendant inadequately stored hazardous waste and failed to comply with PRC regulations,

Defendant nonetheless had no duty under the securities laws to notify shareholders of these facts.

*See, e.g., Steinberg v. PRT Grp., Inc.*, 88 F. Supp. 2d 294, 300 (S.D.N.Y. 2000) (holding that,

when a misstatement is alleged by a plaintiff, "the plain language of [a] prospectus . . . controls

and the court need not accept as true the allegations of the complaint" (citing *Barnum v.*

*Millbrook Care Ltd. Partnership*, 850 F. Supp. 1227, 1232-33 (S.D.N.Y. 1994), *aff'd mem.* 43

F.3d 1458 (2d Cir. 1994)).

This Court can easily dispense with two of the three sections that Plaintiffs claim

constitute material misstatements.  Plaintiffs allege that the following two paragraphs, found in

both the May and November Prospectuses, are materially misleading:

> *Compliance with environmental, safe production and construction regulations can be costly, while non-compliance with such regulations may result in adverse publicity and potentially significant monetary damages, fines and suspensions of our business operations.*
>
> We use, store and generate volatile and otherwise dangerous chemicals and wastes during our manufacturing process, and are subject to a variety of governmental regulations related to the use, storage and disposal of such hazardous chemicals and waste.  We are required to comply with all PRC national and local environmental protection regulations.

(Am. Compl. at ¶¶ 82, 93.)  Despite Plaintiffs' protestations that these statements are misleading,

this Court disagrees.  These paragraphs do, of course, explain to shareholders that Jinkosolar is

obliged to follow certain regulations.  But if anything, they weigh the pluses and minuses of

following such regulations with a disquieting frankness.  The first paragraph, for instance,

explicitly balances the costs of "[c]ompliance" with safety regulations with the "adverse

publicity and potentially significant monetary damages" stemming from "non-compliance."

Similarly, the second paragraph notes that Jinkosolar is "subject" to Chinese regulations, but—

particularly when read alongside the first paragraph—does nothing to indicate any sort of

commitment on the part of Jinkosolar to follow those regulations.

By contrast, the third section of the Prospectuses highlighted by Plaintiffs is a more

complicated matter.  The Prospectuses state in relevant part, under the heading "Environment":

> We generate and discharge chemical waste, waste water, gaseous
> waste and other industrial waste at various states of our
> manufacturing process as well as during the process of recovered
> silicon material.  We have installed pollution abatement equipment
> at our facilities to process, reduce, treat, and where feasible,
> recycle the waste materials before disposal, and we treat the waste
> water, gaseous and liquid waste and other industrial waste
> produced during the manufacturing process before discharge.  We
> also maintain environmental teams at each of our manufacturing
> facilities to monitor waste treatment and ensure that our waste
> emissions comply with PRC environmental standards.   Our
> environmental teams are on duty 24 hours.  We are required to
> comply with all PRC national and local environmental protection
> laws and regulations . . . .

(Am. Compl. at ¶¶ 80, 91.)  Plaintiffs do not contend that any of the statements herein are

inaccurate in and of themselves; that is to say, they do not appear to allege that Jinkosolar did not

use pollution abatement equipment or that Jinkosolar did not employ environmental teams to

monitor Jinkosolar's facilities.  Rather, Plaintiffs' contention is that these statements falsely

imply that Jinkosolar had an effective pollution treatment system and a good pollution record,

and that Jinkosolar had a duty to correct these implications.  In other words, Plaintiffs contend

that, in making the above-quoted statement, Jinkosolar put its environmental record "in play,"

and thus had a duty to inform shareholders of its environmental woes.  *In re Ambac Financial*

*Grp., Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 271 (S.D.N.Y. 2010) (quoting *Shapiro v. UJB Fin.*

*Corp.*, 964 F.2d 272, 282 (3d Cir. 1992)); *cf. United Paperworkers Intern. Union v. Intern'l*

*Paper Co.*, 801 F. Supp. 1134, 1141 (S.D.N.Y. 1992) (finding that a company had misled

investors by creating a "total impression" that it "is a model of environmental rectitude").

Of course, "[s]ome statements, although literally accurate, can become, through their

context and manner of presentation, devices which mislead investors."  *McMahan & Co. v.*

*Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990); *see also United Paperworkers*

*Intern. Union*, 801 F. Supp. at 1141 (determining that, "even if the Court could not identify

specific statements that are at variance with the facts, the total impression conveyed by the

Board's glib response to this proposal is that the Company is a model of environmental

rectitude").  Whether this paragraph is enough to render these Prospectuses materially

misleading is arguably a close call.  The majority of the paragraph is not troublesome:

Jinkosolar's explanation of what systems it has in place to abate pollution, as well as its reminder

about Chinese regulations, are not misstatements, nor would a reasonable investor find that these

statements were misleading by omission.  However, one sentence does give this Court pause:

"We also maintain environmental teams at each of our manufacturing facilities to monitor waste

treatment and ensure that our waste emissions comply with PRC environmental standards."

Read one way, this sentence might signify that, by "maintain[ing] environmental teams,"

Jinkosolar is able to "ensure that our waste emissions comply with PRC environmental

standards."  Read another way, Jinkosolar is merely stating that the environmental teams are

"maintained" with the purpose or function "to monitor . . . and to ensure" compliance.

Given the construction of the sentence, the second reading is the more sensible one.  In any event, this Court cannot say that a reasonable investor would, or even could, read this one, ambiguous sentence as a pronouncement that Jinkosolar is "ensur[ing]" environmental standards were met.  This is all the more true given how cautious Jinkosolar was in its Prospectuses.  As explained *supra*, Jinkosolar carefully laid out the pluses and minuses of abiding by Chinese environmental regulations.  Indeed, elsewhere in the Prospectuses, Jinkosolar underscored to investors that fines due to pollution are a real possibility.[3]  These warnings, together with the overall weakness of the instances of material misstatements and omissions proffered by Plaintiffs, indicate that no reasonable investor could have believed that the Prospectuses ensured a positive environmental record.  *See In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 359 (S.D.N.Y. 2008) (no misstatements where the company "carefully avoid[ed]" making claims about the effectiveness of its risk management system and made "cautionary statements" to investors); *see also Halperin*, 295 F.3d at 357 ("cautionary language" can make it unreasonable for an investor to be misled).  Because the Prospectuses do not create a "total impression" that Jinkosolar was "a model of environmental rectitude," Plaintiffs have not adequate pleaded a material misstatement or omission.  *United Paperworkers Intern.*, 801 F. Supp. at 1141.

The notion that the above-quoted statements create "the clear impression of compliance" (Pls.' Opp'n. at 18) is perhaps most clearly undermined when the facts of this case are compared to the line of recent opinions out of this Court—relied on heavily by Plaintiff in its opposition motion—finding material misstatements where defendants claimed to be compliant with standards promulgated by themselves or regulatory agencies.  *See, e.g.*, *In re Ambac Financial*

---

[3] Given the notorious environmental track records of other Chinese companies in the business of producing PV products, a reasonable investor would expect that a company dedicated to environmental compliance would not bury that commitment in insinuation.  (*See* Am. Compl. at ¶¶ 42-51 (noting that the environmental fallout from the making of PV products, particularly those made in China, is well known.))

*Grp.*, 693 F. Supp. 2d at 277 (finding a material misstatement when defendant claimed to be in

"compliance with current Ambac Assurance underwriting standards" when it was not); *In re*

*CitiGroup Inc. Bond Litig.*, 723 F. Supp. 2d 568, 580 (S.D.N.Y. 2010) (plaintiff pleaded a

material misstatement by alleging defendant had falsely represented that its financial statements

complied with Generally Accepted Accounting Principles); *In re Bear Stearns Cos. Inc. Sec.,*

*Derivative, and ERISA Litig.*, 763 F. Supp. 2d 423, 459 (S.D.N.Y. 2011) (defendant's statement

that it was "in compliance with CSE regulatory capital requirements" was materially false).

These decisions involved statements bearing little similarity to the statements by Jinkosolar in its

Prospectuses.  Stating that one's company maintains employees to ensure compliance is not at all

the same as claiming to be in compliance.  *Accord In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d at

362 (finding no material misstatement where the defendants "never claimed that the company

was in full compliance with all regulations, or that it had no outstanding regulatory issues"

(citation and internal quotation marks omitted)).

Plaintiffs' Rule 10b-5 claim must therefore be dismissed.  By extension, Plaintiff's

"control person" claim under Section 20 must be dismissed as well.

> **B.     Securities Act Claims**

Sections 11 and 12(a)(2) of the Securities Act prohibit material factual misstatements or

omissions in securities registration statements and offering prospectuses.  Similarly, Section 15

makes control persons of companies liable for Section 11 and 12(a)(2) violations of their

employers.  Plaintiffs have brought claims under these three sections of the Securities Act.

Given the Court's conclusion with respect to Plaintiffs' Exchange Act Claims, these

claims can be disposed of in short order.  Because this Court has found that there were no

material misstatements or omissions in Defendants' prospectuses, these claims also fail as a

matter of law.  *See Rombach v. Chang*, 355 F.3d 164, 172 n.7, 177-78 (2d Cir. 2004) (test for

whether a statement is false or misleading is the same under the Securities and Exchange Acts).

## III.    Conclusion

For the foregoing reasons, Defendants' motions to dismiss are GRANTED in their

entirety.  The Clerk of the Court is directed to close the motions at docket numbers 62 and 65

and to close this case.

SO ORDERED.

Dated: New York, New York
       January 22, 2012

_____
                    J. PAUL OETKEN
              United States District Judge

15